[No. 4034–1.   Division One.   June 6, 1977.]

NELSE MORTENSEN & CO., INC., ET AL, *Respondents,*
v. GROUP HEALTH COOPERATIVE OF PUGET
SOUND, *Appellant.*

*Houghton, Cluck, Coughlin & Riley, John W. Riley, Jack R. Cluck,* and *William N. Mathias III,* for appellant.

*Oles, Morrison, Rinker, Pickel, Stanislaw & Ashbaugh, Bruce T. Rinker, Richard M. Stanislaw, Short, Cressman & Cable,* and *David R. Koopmans,* for respondents.

PEARSON, J.—Group Health Cooperative of Puget Sound (Group Health) appeals from a judgment totalling

$614,782.77 for damages due to delays in the remodeling and construction of additions to Group Health Hospital in Seattle. The judgment was awarded to the construction project's general contractor, Nelse Mortensen & Co. (Mortensen), and to subcontractors Berg Plastering, Inc. (Berg), Industrial Electric–Seattle, Inc. (Industrial Electric), and W. L. Henson Co., Inc. (Henson), on a theory of semitortious interference by Group Health with the contractors' performance of their work under the contract. The dispositive issue in this appeal is whether the construction delays caused by the owner, Group Health, and its architect were so unreasonable as to justify disregard of certain contractual clauses providing for no damages due to owner–caused delay. We conclude the trial court erred in holding that the contract was not intended to encompass the delays which occurred in this case, and we reverse.

THE FACTS OF THE CASE

There is no question the construction project undertaken by Mortensen was difficult and complex. The contract dated May 1, 1969, called for a completion date of November 8, 1971. Construction was planned in four distinct phases: (1) The first 18 months were to be devoted to demolition and excavation of the site of the new structure, erection of an 8–story building, and interior finishing of its two basements and third floor. (2) The next 4 months were for completion of the remaining floors of the addition, plus demolition and remodeling of lower levels of the existing hospital—which could only begin after certain areas under phase 1 were completed and available for hospital activities displaced by the phase 2 remodeling. (3) Phase 3 was to take 4 months for demolition and remodeling of the surgery areas of the hospital's fourth floor. Again, however, commencement of this phase depended upon completion of the new surgery areas under construction in phases 1 and 2. (4) The final phase, also planned for 4 months, involved demolition and remodeling of the fifth floor of the old hospital, which could begin only after completion of new areas

in phases 2 and 3 to accommodate the nursery, obstetrics, and delivery room activities displaced by phase 4. The hospital could maintain patient care with minimum disruptions by proceeding with construction by phases, which required detailed scheduling for the transfer of facilities from the old structure to the new.

There were additional complicating factors known to the parties before the project began. The new structure was to adjoin the old, thereby necessitating level connections between the two buildings and limiting the ceiling spaces in the new building to the same sizes as existed in the old hospital. The new building was to be fully air conditioned, which created uncommon problems of fitting the heating and cooling system into smaller ceiling cavities than those found in most modern construction. A city height limitation on new buildings made it necessary to fill the available space with as much new construction as possible in order to obtain the desired amount of additional square footage; this was expected to cramp the construction site all the more. In addition, two streets bordering the site could not be closed off because they were major arterials.

Besides the unusual difficulties involved in this project, hospital construction is inordinately complex because provision must be made for such factors as extensive plumbing work and electrical circuitry, installation of tracks to supply intravenous feeding and oxygen and other gases, a complete communications network, and various other medical diagnostic and treatment apparatus.

Mortensen had built hospitals before and knew, or should have known, of the complexities common to hospital construction, and of the difficulties inherent in the Group Health job. Despite these difficulties, Mortensen believed the job could be completed in 2 years. Nevertheless, in accordance with the contract, it submitted to the architects, The Richardson Associates, a detailed "critical path schedule" calling for a November 8, 1971, completion date. This was the only schedule maintained by Mortensen on the job site to monitor and schedule the progress of the work. The

architect testified that he allowed at least three formal extensions of the contract completion date: an initial 41–day extension due to a delay in City of Seattle approval of the site excavation; a 93–day extension for labor disputes in the summer of 1971; and a 5–day extension caused by bad weather in December 1971. In its oral opinion, the trial court indicated that the contract completion date had been extended to April 8, 1972.[1] The project was substantially completed on June 30, 1972—less than 3 months later.

The trial court based its decision on a finding that Group Health and its architect were responsible for unreasonable delays and that Mortensen and the subcontractors were entitled to recover additional costs and profit caused by Group Health's "unreasonable" interference with their timely performance of the contract. In essence, the court decided that the delays attributable to the hospital were so substantial that they were outside the contemplation of the parties and their contractual terms relevant to delays and extra compensation, thereby warranting a recovery in quantum meruit. We must examine the contract to review this decision. The basic contract documents are standard American Institute of Architects (AIA) forms.

### THE CONTRACT PROVISIONS

Section 8.2.2, as amended, provides as follows:

8.2.2 The contractor shall begin the work on the date of commencement as defined in subparagraph 8.1.2. He shall carry the work forward expeditiously with adequate forces and shall complete it within the contract time.

It is the responsibility of the contractor to complete the work within the contract time. The owner makes no promise or representation that this can or will be done.

Section 8.3 provides:

DELAYS AND EXTENSIONS OF TIME
8.3.1 If, however, the *contractor is delayed* at any time in the progress of the work *by any of the following causes, the contract time shall be extended* for such reasonable

---

[1] In contrast, the court's written finding was that Group Health did not extend the time for completion.

time as the architect shall determine. The contractor agrees to complete the work within the contract time as thus extended. *Such extensions* shall postpone the beginning of period for payment of liquidated damages but they and the events producing them *shall not be ground for claim by the contractor of damages or for additional costs, expenses, overhead or profit or other compensation.*

.1 Floods, fire, strikes, lockouts, war, acts of the public enemy, acts of God.

.2 *Change Orders*

.3 Acts of performance or delays in performance by other contractors employed by owner or their subcontractors.

.4 *Causes beyond the control of the contractor,* the delays from which could not have been avoided through the exercise of reasonable care, prudence, foresight and diligence on his part and that of his subcontractors.

8.3.2 *All claims for extension of time shall be made in writing to the architect no more than fifteen days* after the contractor knows or by reasonable diligence should know of the event causing or likely to cause the delay; *otherwise they shall be waived.* In the case of a continuing cause of delay only one claim is necessary.

*In the case of change order work he must make the claim for extension within fifteen (15) days* after receiving from the architect the notice to proceed with the change order work.

8.3.3 If no schedule or agreement is made stating the dates upon which written interpretations as set forth in subparagraph 1.2.5 shall be furnished, then *no claim for delay shall be allowed on account of failure to furnish such interpretations until fifteen days after demand is made for them,* and not then unless such claim is reasonable.

(Italics ours.) It is significant that section 8.3.4 of the standard AIA agreement, which expressly allows the contractor to claim damages for delay, was deleted by the parties to this contract. In addition to the foregoing, the following provisions are relevant.

Section 12.1.1 of the contract's general conditions pertained to change orders:

*The owner, without invalidating the contract, may order changes in the work* within the general scope of the contract consisting of additions, deletions or other revisions, *the contract sum and the contract time being adjusted accordingly. All such changes in the work shall be authorized by change order,* and shall be executed under the applicable conditions of the contract documents.

(Italics ours.) Change orders were initiated under the contract by the architect, who would issue to Mortensen a "Request for Proposal" form describing the proposed change and requesting a price quotation. Mortensen would submit a bid and when the parties reached agreement on a price, a change order followed according to the procedure detailed in Supplemental General Condition section 106:

.1 It is expected that the formal change order procedure will be implemented by a procedure between architect and contractor in which the architect will issue written requests for proposals on additions, deletions and revisions in the work and the contractor will furnish written proposals. The work on the changes will not be commenced until there is agreement on compensation to be paid for it, including overhead and profit.

In making this proposal to do such work, the contractor shall present it to the architect in a form showing in a complete breakdown the direct costs of labor and material and of the use of any construction equipment to be used in making the change, and showing in a combined percentage the overhead and profit requested which shall be the only compensation to be paid for the work in addition to the direct costs of labor, material and use of construction equipment. Direct costs of labor shall include such items as payroll taxes and insurance, separately stated, but shall not include any labor or supervision above the level of foreman.

.2 The contractor and his subcontractors shall add the following percentages to their direct costs.

.2.1 General Contractor:

15% overhead and profit on his direct costs of labor and material.

10% overhead and profit on his cost of use of construction equipment.

10% overhead and profit on agreed amount of subcontractor's proposal on the particular work.

.2.2 Subcontractors:

15% overhead and profit on his direct costs of labor and material.

10% overhead and profit on his cost of use of equipment.

10% overhead and profit on agreed amount of subcontractor's proposal on the particular work.

. . .

.4 *Agreements thus arrived at through the requests for proposals method shall later be incorporated in change orders and shall be subject to the provisions of the contract relating to change orders.*

. . .

.7 *The contractor agrees to perform the change order work requested by the architect or the owner and not to claim additional compensation for delay or claim damages arising out of the giving of them* or out of the amount of them or out of the times when ordered, *his full compensation for the doing of them being the payments provided* according to one of the methods outlined *in Article 12 as supplemented* in the Supplementary General Conditions.

(Italics ours.)

The "Request for Proposal" forms stated as follows:

*This proposal, if accepted, will modify your contract and,* unless stated to the contrary, covers everything in connection with this change; *does not extend the time of completion; shall be subject to the same terms, conditions, specifications and drawings as contained in said contract.*

(Italics ours.) This statement comported with the contract's Supplemental General Condition section 106.4. Each change order provided that it became a part of the original contract documents. In all, 81 change orders were executed, increasing the contract price, as found by the court, by $574,718 to a total of $6,867,786.

Section 12.1.3 covers the method of calculating the cost or credit to the hospital resulting from a change in the work:

12.1.3 *The cost* or credit *to the owner resulting from a change in the work shall be determined in one or more of the following ways:*
.1 by mutual acceptance of a lump sum properly itemized;
.2 by unit prices stated in the contract documents or subsequently agreed upon; or
.3 by cost and a mutually acceptable fixed or percentage fee.

(Italics ours.) Sections 12.1.7 and 12.2.1 pertain to contractor's claims for additional costs or extensions of time:

12.1.7 *If the contractor claims that additional cost or time* is involved because of (1) any written interpretation issued pursuant to subparagraph 1.2.5, (2) any order by the architect to stop the work pursuant to subparagraph 2.2.12 where the contractor was not at fault, or (3) any written order for a minor change in the work issued pursuant to paragraph 12.3, *the contractor shall make such claim as provided in paragraph 12.2.*
12.2.1 *If the contractor wishes to make a claim for an increase in the contract sum or an extension in the contract time, he shall give the architect written notice thereof within a reasonable time* after the occurrence of the event giving rise to such claim. *This notice shall be given by the contractor before proceeding to execute the work,* except in an emergency endangering life or property in which case the contractor shall proceed in accordance with subparagraph 10.3.1. *No such claim shall be valid unless so made.* If the owner and the contractor cannot agree on the amount of the adjustment in the contract sum or the contract time, it shall be determined by the architect. *Any change in the contract sum or contract time resulting from such claim shall be authorized by change order.*

(Italics ours.)

### THE NATURE OF THE DELAYS

The linchpin of the plaintiffs' case, and ultimately the court's judgment, was plaintiffs' exhibit 11. That is a lengthy document relating to each of 146 significant delays encountered by Mortensen and various subcontractors on the job, which was compiled by Marlin Erb, Mortensen's

construction superintendent for the Group Health job. The exhibit was compiled in early 1973 to aid in documenting Mortensen's claim for delays, and was used by Mr. Erb to refresh his memory during his marathon testimonial description of the cause and resolution of all 146 delays. The exhibit and Mr. Erb's testimony formed the basis for admission of a myriad of memos, requests for proposals, change orders, and other correspondence relating to the delays.

Most of the delays involved specifications that called for installation of the wrong material, or installation in an untenable manner, or last–minute changes in design or material. Common procedure was for an oral stop order to issue, either upon Mortensen's notification that a problem had been encountered and its request for an interpretation, or the architect's transmittal of a change in plans. The oral stop would ordinarily be followed by a written confirmation and the architect's request for proposal or simply a period of time while an interpretation was prepared for the guid-ance of the contractor. Often, a flurry of clarifying corre-spondence was exchanged as the parties sought to define the change and arrive at a new price by change order, if necessary.

In the interim before a stop order was lifted, Mr. Erb testified the workmen would have been relocated as follows:

A When you receive this stop order, why, in this case here, I immediately make up work copies for the subcon-tractors involved, and so designate on their copies, and hand carry them to the various superintendents and foremen on the job that it affected. And they, in turn, would pull their men off of this part of the work, however many they had, one, two or three, or whatever, and look for another place to put these people, move their tools and equipment, maybe staging or scaffolding, to another location where they could work.

Q Is that true of prime contractor, too, if he was working in the area?

A Oh, yes.

Q Does it ever result in having to send the men home, stop orders, depending on the work force?

A I would say yes. It would effect a reduction of the crew, depending on which stop order we received, and what it pertained to.

Q Does the length or the extension of the time involved in the stop order, can it affect the efficiency of the overall operation?

(Objection and ruling omitted.)

A Yes, it does. It disrupts the construction sequence of a building, which is used to the best of my knowledge by all contractors, in which you have a certain sequence that you have to erect a building by the structure, you have to follow up with your mechanical and your framing, and your mechanical and electrical end of the framing, and all these items have to follow in a certain sequence so that each crew can follow in behind the other, because you do not have time to wait for one trade to complete an item. You have to have a sequence of operation, one starting immediately after the other, and others to follow.

Mr. Erb described the number of changes and stop orders involved in the Group Health job as "very, very many more" than usual and described the architects as "very slow and late in acting upon" crucial decisions and interpretations.

On the other hand, the architect's representative and construction superintendent testified to the unusual complexity of the job and, going over Mr. Erb's narrative, characterized the delays that did occur as minor in nature. This was because the workmen in most cases could simply move to another area on the same floor of the project and resume their activity, so that any time spent in waiting for an architect's reply on a problem in a particular location would seldom cause more than momentary delay in construction activity of the workmen involved. Of the 146 claimed delays, Group Health points out that 78 concluded in change orders for which it made extra payments to Mortensen totalling nearly $600,000; 27 related to interpretations of the contract that did not involve extra work or material and that were given in 15 days or less by the architect, as covered by the contract, section 8.3.3. Of the others, Group Health does not contest 4 of the claims; the

remaining 37 are claims involving architect's interpretations given more than 15 days after demand, but which did not involve extra work or material and for which no extra compensation was claimed until the project had been substantially completed. It was not until November 1972—some 5 months after substantial completion and after receipt of retained percentages totalling $645,000—that Mortensen demanded specific compensation for the alleged delays.

## THE APPLICABLE CASES

The long line of cases pertinent to the issue of owner-caused delays begins with *Goss v. Northern Pac. Hosp. Ass'n*, 50 Wash. 236, 96 P. 1078 (1908). In *Goss* an independent contractor was hired to install plumbing and heating, and his failure to perform on time resulted in damage to the general contractor, Goss. The contractual provision at issue read as follows, at page 237:

"Should the contractor be obstructed or delayed in the prosecution or completion of his work by the act, neglect, delay or default of the owner or the architects, or of any other contractor employed by the owner upon the work, or by any damage which may happen by fire, lightning, earthquake or cyclone, or by the abandonment of the work by the employees through no default of the contractor, then the time herein fixed for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all of the causes aforesaid; but no such allowance shall be made unless a claim therefor is presented in writing to the architects, within twenty-four hours of the occurrence of such delay.

The Supreme Court held that damages for delay were not recoverable against the owner, applying the following rationale at pages 238–39:

For conditions which arise in the execution of a contract and for which the contract itself makes no provision, the courts are at liberty to apply the ordinary legal remedies when these conditions become a subject of controversy between the contractors; but where the probability of the happening of the condition has been foreseen and a remedy is provided for its happening, the presumption is that the parties intended the prescribed remedy as the

sole remedy for the condition, and this presumption is controlling where there is nothing in the contract itself or in the conditions surrounding its execution that necessitates a different conclusion. . . . The contract was an ordinary building contract, in which the parties undertook to put in writing all of their rights and liabilities thereunder. It provided for every condition that could arise in its execution, leaving nothing to surmise or inference, and we think it must be held to contain the entire agreement.

Next in time is the case of *Byrne v. Bellingham Consol. School Dist. 301,* 7 Wn.2d 20, 108 P.2d 791 (1941). An independent electrical contractor was delayed by the failure of the general contractor to maintain the project in such a state of forwardness as would allow the plaintiff, Byrne, to complete its duties on time. Article 18 of the contract allowed extensions of time (which had been granted several times), but expressly did not "exclude the recovery of damages for delay by either party under other provisions in the contract documents.'" Those delay provisions were in article 31:

Damages.—If either party to this Contract should suffer damage in any manner because of any wrongful act or neglect of the other party or of anyone employed by him, then he shall be reimbursed by the other party for such damage.

"Claims under this clause shall be made in writing to the party liable within a reasonable time at the first observance of such damage and not later than the time of final payment, except as expressly stipulated otherwise in the case of faulty work or materials, and shall be adjusted by agreement or arbitration."

*Byrne v. Bellingham Consol. School Dist. 301, supra* at 24.

In allowing a recovery for delay, our Supreme Court reasoned as follows per the late Justice William J. Steinert:

The rule announced by the courts in practically every state in the union, including this state, is that, in the absence of any provision in the contract to the contrary, a building or construction contractor who has been delayed in the performance of his contract may recover from the owner of the building damages for such delay if

caused by the default of the owner. . . . Such right of recovery is predicated upon the breach of what we have already stated is an implied obligation on the part of an owner to furnish to the contractor a building in a state of forwardness sufficient to enable the contractor to complete his contract within the time limit.

In the contract here under consideration, there is no express provision against the remedy sought by appellant, and whether or not any such provision is to be implied, is one of the questions now to be determined. . . .

The first paragraph of article 18 . . . is clearly analogous to the contractual provisions which determined the result in the *Goss* case, . . . However, the last paragraph of article 18 contains a provision that, so far as we have been able to discover from an examination of the records and from the opinion in the *Goss* decision, did not appear in the contract involved in that case. Nor, . . . were there any provisions in the *Goss* case comparable to those of article 31, quoted above. . . . The last paragraph of article 18, read in connection with article 31, makes specific provision for a remedy in damages, in addition to the right of time extension; and, consequently, there is no occasion, or room, for a "presumption" to the contrary.

(Citations omitted.) *Byrne v. Bellingham Consol. School Dist. 301, supra* at 31–34.

One year after *Byrne,* Justice Steinert also authored the opinion in *Ericksen v. Edmonds School Dist. 15,* 13 Wn.2d 398, 125 P.2d 275 (1942), a case affirming the dismissal of a general contractor's suit for damages due to the architect's breach of contract in furnishing erroneous and incomplete plans and hindering the work. The key paragraph of the contract provided at page 405:

"CLAIMS FOR DAMAGES AND EXTENSIONS OF TIME. The Contractor shall not be entitled to any claim for damages on account of hindrances or delays from any cause whatsoever, but if occasioned by any act of God, or by any act or omission on the part of the Owner, such act, hindrance, or delay may entitle the Contractor to an extension of time in which to complete the work which shall be

determined by the Architect, provided that the Contractor will give notice in writing of the cause of such act, hindrance, or delay within ten days (10 days) after its occurrence."

The court recognized the decisive question was whether the quoted provision limited the contractor's remedy to an extension of time. After reiterating the general rule stated in *Byrne,* the court declared at pages 409–10:

Where, however, the contract expressly precludes the recovery of damages by the contractor for delay caused by the default of the owner, that provision will be given full effect. . . .

The language of such preclusive provisions is, however, usually given a strict construction because of the harsh results which may flow from the enforcement thereof. But when it is clear that a given result comes within the terms of such a provision, the mere fact that the result is a harsh one will not prevent the application of the rule. Whether a given contract provision precludes the recovery of damages in accordance with the rule just announced depends upon the particular language in which it is cast, the nature of the default involved, and the various other circumstances of the case.

(Citations omitted.)

The court went on to distinguish the result in *Byrne* from that in *Goss*

solely because the contract in the *Byrne* case contained a specific clause providing for reimbursement of the contractor for damage sustained by him by reason of the wrongful act or neglect of the owner or of anyone employed by him. The contract in the *Goss* case, like that in this case, contained no such clause.

*Ericksen v. Edmonds School Dist. 15, supra* at 413.

More recent decisions begin with *Bignold v. King County,* 65 Wn.2d 817, 399 P.2d 611 (1965). Bignold contracted to build a road for King County. The suit was based on quantum meruit for work done and costs incurred which had not been anticipated in the contract. One claim was for increased operating costs resulting from the delay of the county's engineering crews in furnishing requested pipe

measurements and in staking the road with alignment and grade stakes. The latter delay caused Bignold to dig unsuitable drainage ditches, which later required reexcavation. There was no contractual provision covering delays caused by the county, so the Supreme Court applied the general rule that in every construction contract there is an implied term that the owner will not delay or hinder the contractor, and for such delays the contractor is entitled to recover extra compensation. As for certain unanticipated circumstances making performance more difficult and more costly, the court acknowledged that recovery for additional costs will generally be allowed when the condition could not reasonably have been anticipated by either contracting party. Finding nothing in the contract to preclude recovery for owner–caused delay or for changed conditions, the court upheld the award of damages on the quantum meruit theory.

*V.C. Edwards Contracting Co. v. Port of Tacoma*, 83 Wn.2d 7, 514 P.2d 1381 (1973), was again a case in which the contractor was allowed to recover damages in quantum meruit for owner–caused delay. Edwards contracted with the Port of Tacoma to construct a rail service yard and connecting trackage. The plans called for 1,000 yards of fill to be used as ballast under the track. The contractor's attention was called to five separate places where a sewer project would interfere with the rail project. In fact, the job required an extra 92,000 yards of fill to be used as ballast, and the sewer project crossed Edwards' work in over 30 places.

The Court of Appeals upheld the trial court's award of costs for extra work plus profit in quantum meruit. *V.C. Edwards Contracting Co. v. Port of Tacoma*, 7 Wn. App. 883, 886, 503 P.2d 1133 (1972). The contract provided that the contractor would not "be charged with liquidated damages or any excess cost" when the work was delayed by "unforseeable [*sic*] cause beyond the control and without the fault or negligence of the contractor." The Port argued that this clause gave the contractor the sole remedy of a

time extension for owner–caused delay. We disagreed, noting that this provision impliedly allowed the *Port* the remedy of a time extension in the event of a delay beyond the control of the contractor. There was, however, no provision precluding the *contractor's* recovery for owner–caused delay. Citing *Bignold v. King County, supra,* we held that recovery in quantum meruit is proper where an owner–caused delay is so substantial as to materially alter the contract and requires the contractor to perform extra work not contemplated in the contract.

The Supreme Court affirmed, distinguishing *Goss* and *Ericksen* on the grounds the express contract provisions in those cases either allowed an extension of time to the contractor (in *Goss*) or precluded the recovery of damages (in *Ericksen*). The Supreme Court again recognized the existence in every construction contract of an implied term that the owner will be liable for delays caused by him, and found that the delays caused by the Port were so substantial as to remove the contract as a practical basis for computing damages. Therefore, quantum meruit was an appropriate measure of recovery where the contractor should not have anticipated the changed conditions.

The most recent case in point is *S.L. Rowland Constr. Co. v. Beall Pipe & Tank Corp.,* 14 Wn. App 297, 540 P.2d 912 (1975), decided after the judgment herein. The contract called for construction of an 11 1/2–mile–long segment of a steel pipeline for the City of Everett. The job was completed nearly a year late, and Rowland sued the city for additional compensation for added work and costs allegedly incurred due to delays caused by the city's extensive changes in the plans after the contract had been let. As in the instant case, in *Rowland* the contract provided for written change orders to be issued to the contractor if unforeseen conditions required major changes. Rowland also waived "claim for damages due to hindrance or delay," but in lieu thereof the city agreed to grant extensions for time so lost, according to a stated formula.

The Court of Appeals held that the waiver of damage clause expressly barred the contractor's recovery, distinguishing *Bignold v. King County, supra,* and *V.C. Edwards Contracting Co. v. Port of Tacoma, supra,* because "[n]othing in those opinions . . . indicates that the contracts there involved had clauses comparable to the 'no damage' clause in this contract." *S.L. Rowland Constr. Co. v. Beall Pipe & Tank Corp., supra* at 306.

The court also discussed Rowland's attempted proof of damages by the "total cost basis," *i.e.,* all of its costs over the entire job plus an additional sum to cover overhead and profit under the theory of quantum meruit. While noting that total cost basis had been approved under the facts of *V.C. Edwards Contracting Co. v. Port of Tacoma, supra,* the court stated that it was not an appropriate basis of establishing damages where, as in the case before it, there had been no substantial changes such as were outside the coverage of the contract and outside the realm of anticipation or discovery of the contractor.

We have summarized and recited from the foregoing cases in order to present the complete development of the pertinent cases, beginning with *Goss.* These cases fall within one of two classes. Either the contractual provisions involved have been applied to defeat an attempted recovery by the contractor, or a recovery has been allowed on the theory of quantum meruit. But there is one controlling factor in each decision: presence or absence of a clause which limits or bars a contractor's claim for damages caused by the owner. In *Goss, Ericksen,* and *Rowland,* such a clause was held to preclude recovery against the owner. In every case in which recovery was allowed there was no such clause.[2]

---

[2]While this opinion was in preparation, the Court of Appeals filed its decision in *Seattle v. Dyad Constr., Inc.,* 17 Wn. App. 501, 565 P.2d 423 (1977). That is another case allowing the contractor's recovery for damages on the grounds that the parties had not contemplated delays of the unreasonable nature actually caused by the owner (City of Seattle) when they included a contractual provision simply entitling the contractor to extensions of time in the event of delays.

## THE TRIAL COURT'S DECISION COMPARED
## WITH THE CONTRACT

■ We turn to an analysis of the trial court's decision in this case. In order to base its quantum meruit award of damages upon a semitortious theory of recovery, it was necessary for the court to have found that the activity complained of was outside the scope of the contract. The court made no such formal finding. Instead, the findings as to Mortensen, as well as subcontractors Berg, Henson, and Industrial Electric, speak of hindrance and delay on the part of Group Health causing "unreasonable delay to the contractor and its subcontractors beyond a reasonable doubt" and increasing the time of performance as a "direct and proximate result." We may consider the court's oral opinion insofar as it is consistent with and amplifies the findings of fact. *V.C. Edwards Contracting Co. v. Port of Tacoma, supra; Bowman v. Webster,* 42 Wn.2d 129, 253 P.2d 934 (1953). The following excerpts from the oral opinion help in construing the court's decision:

This is an action to recover damages occasioned in the performance of a construction contract allegedly resulting from *unreasonable delay* on the part of the defendant primarily through its architect. That is the gist of this action as I see it.

The contract, in its terms, is silent in respect to such damages and occasion. Understandably, people enter into a contract in good faith. They don't contemplate there is going to be any such unreasonable conduct on the part of anyone, and it was silent in this case.

. . .

Now I agree with you, Mr. Riley, that the subcontractors have no privity of contract and are therefore on that basis not entitled to a judgment or judgments. However, in my judgment *this action* is not founded upon the contract. It is founded upon the *"unreasonable delay"* which is a semitortious action outside the expressed terms of the contract and where they have been injured, where two contracting parties are interfered with by someone else to their damage, I think they are entitled to recover. So that is the theory and the basis of my decision.

The trial court thus held, in effect, that this contract—although it did refer to "delays"—was silent with regard to "unreasonable" delays of the sort that occurred here, outside the contemplation of the parties. On the contrary, we believe the contract covered these delays.

The contract contains several ways the contractor could be compensated for owner–caused delay.

1. Change Orders. Some revisions of the plans were contemplated to result in change orders. Supplemental General Condition section 106.1 (as revised) contemplates that work on the proposed changes would be held up while the parties agreed on a price for the extra work, including overhead and profit. The compensation was calculable according to the schedule set forth in section 106.2. In the event change order work was requested other than through an architect's written request for proposal, section 12.1.3 of the contract provides an express method of determining the cost (or credit) to Group Health. As we have seen, 78 of the items claimed for delay resulted in change orders for which nearly $600,000 had already been paid.

2. Requests for Proposals not Resulting in Change Orders. Arguably sections 106.1 and 106.2 were intended to fix compensation only if formal change orders were issued. Clearly, many requests for proposals did create extra work without change orders being utilized. In such instances, section 106.7 refers to article 12 for the methods of calculating compensation. For convenience, we restate section 106.7:

> .7 The contractor agrees to perform the change order work requested by the architect or the owner and not to claim additional compensation for delay or claim damages arising out of the giving of them or out of the amount of them or out of the times when ordered, his full compensation for the doing of them being the payments provided according to one of the methods outlined in Article 12 as supplemented in the Supplementary General Conditions.

We construe this section as applying to all situations in which requests for proposals were made which did not culminate in change orders. The contractor is to rely on article 12 for compensation and not to claim additional damages "arising out of [a] the *giving* of them [change orders] *or* out of [b] the *amount* of them [change orders] *or* out of [c] the times *when ordered* . . ." (Italics ours.) The last clause obviously pertains to occasions when change orders are requested but are not given. This conclusion is buttressed by two factors. The entire article 106 has the sole purpose of implementing the change order procedure and compensation therefor, and should be read if possible to provide for all contingencies within its terms. Secondly, the term "Change Orders" is capitalized throughout the contract when used as a noun with a specific meaning; yet in section 106.7 the words "change order work" appear in lower case as, we are convinced, a term more broadly used to refer to all such work associated with the procedure created and implemented by that section, including the requesting of proposals that do not culminate in change orders. As thus reasonably interpreted, the contract provides for compensation for a number of Mortensen's claims for delay.

3. Delays due to Slow Architect Interpretations. These delays are covered by section 8.3.3, in which Mortensen may make a claim for delay after three conditions have been satisfied: (a) he made a demand for interpretation, (b) the architect delayed at least 15 days in responding, and (c) the ensuing claim is reasonable. If these conditions are met, the contractor could make his claim for extension of time per sections 8.3.1 and .2.

Section 8.3.1 explicitly limits the contractor's remedy for delays to extensions of time, and precludes claims "for damages or for additional costs, expenses, overhead or profit or other compensation," when the delays are caused by:

.1 Floods, fire, strikes, lockouts, war, acts of the public enemy, acts of God.
.2 Change Orders.

.3 Acts of performance or delays in performance by other contractors employed by owner or their subcontractors.

.4 Causes beyond the control of the contractor, the delays from which could not have been avoided through the exercise of reasonable care, prudence, foresight and diligence on his part and that of his subcontractors.

We are convinced that section 8.3.1.4, in contemplating time extensions for delay due to unforeseeable causes "beyond the control of the contractor," was intended to foreclose damage claims based on owner–caused delay. Other specific possible causes of delay are previously enumerated and will allow him time extensions. This clause broadly covers delays due to causes beyond his control that he could not reasonably have foreseen. It is all–inclusive of such causes, and our interpretation that time extensions were to be the sole remedy for owner–caused delays is supported by the knowledge that the form section 8.3.4 allowing the contractor damages for delay was deleted from this agreement. To balance the equation in favor of Mortensen, sections 12.1.7 and 12.2.1 afford him a procedure by which he could claim an increase in the contract sum if necessitated by architect's interpretations, stop orders, or minor changes in the work. These possibilities exist in addition to compensation for change orders and, as we have discussed, allow payment, per section 106.7, for work resulting from requests for proposals not culminating in formal change orders. The contract thus gives Mortensen a variety of avenues to pursue reasonable compensation for extra work.

The trial court attributed "unreasonable delay" to Group Health in several respects in its finding No. 7, which we summarize as follows:

(a) The plans were incomplete and had not received approval from required authorities and were submitted to bidders without notice of same.

(b) The contract documents contained errors in excess of those normally to be expected in such a contract.

(c) Work had to be stopped at the outset in order to obtain a city permit and other approval for underground work.

(d) The owner and architect failed to correct faulty plans and specifications called to their attention.

(e) Architects' interpretations were often not furnished within any reasonable time.

(f) Change orders were not diligently processed.

(g) Approximately 850 requests for proposals were made and decisions on them were often delayed.

(h) Remodeling was delayed because of the owner's failure to make work areas available.

(i) Requests for Proposals and Field Orders were so excessive as to amount to undue interference.

(j) The owner/architects' determinations that new and different work should be performed resulted in work stoppages, and those determinations were not promptly or seasonably made.

Contrary to the position taken by the trial court, we find that the circumstances described by these findings either fall within specific provisions of the contract or are covered by general provisions or conditions incident to the making of the contract.

(a) and (c). Mortensen admitted in discovery that all errors, omissions and discrepancies had been corrected by change order. The City of Seattle did issue a stop order pending final approval of a building permit, but the contract, section 4.7.1, required the contractor to "secure and pay for all permits, governmental fees and licenses necessary." In addition, change order No. 2 granted an extension of time and an increase in the contract price of $31,260.39 for the delay in approval of the permit.

(b) and (d). General Conditions section 4.2.1 provided:

> The contractor shall carefully study and compare the agreement, conditions of the contract, drawings, specifications, addenda and modifications and shall at once report to the architect any error, inconsistency or omission he may discover; . . .

This provision indicates the parties anticipated the existence of errors and omissions in the plans. Again, Mortensen admitted that all errors, omissions and discrepancies had been cured by change order, and the revision or correction of defective plans was contemplated in the change order sections of the contract.

(e) The contract did contemplate and include, in section 8.3.3, a 15–day schedule of reasonableness within which the architect was to produce interpretations as requested. Yet the court made no attempt to distinguish between timely interpretations and those that were late.

(f) Sections 12.1.1, 12.1.3, and 106.7 all provide for adjustments in the contract sum and the time of completion resulting from change orders. Section 106.7 expressly provides that additional compensation for delay shall not arise out of change order work except according to article 12, as supplemented. Delay in the change order process was obviously anticipated and provided for in the agreement.

(g) and (i). The request for proposals method was initiated by section 106.1, which contemplated that the owner would make proposals for changes in the work and the contractor would provide estimates as to the cost thereof. We have previously described the way in which article 106 and article 12 were intended to resolve and compensate for delays incident to requests for proposals.

(h) This finding ignores contract requirements for sequential contruction of the project in order to maintain defendant's ability to provide continuous health care to its patients. There was, again, no attempt by the court to segregate those instances in which access was delayed because of an unready state of replacement facilities from those in which defendant simply failed to provide access in violation of the contract, if any.

(j) Sections 106.1 and .7 contemplated that new and different contract work would be requested, within the scope of the contract, and provided for compensation for delays thereby incurred.

As the foregoing analysis demonstrates, the sort of delays for which damages were awarded by the trial court were contemplated by the contracting parties and should be controlled by the contractual remedies, unless the delays can be said to be so excessive and unreasonable as to fall outside the scope of the contract and warrant an additional recovery in quantum meruit.

As we have noted, an experienced hospital contractor such as Mortensen should have known of the general difficulties to be faced. We have also detailed the unusual problems involved in this project, including the linking of the new hospital construction to the existing floors. The contracting parties did provide for extensions of time in order to preclude damages based on delay inherent in job change orders and architectural interpretations; the contract also provided for certain revisions based on faulty or incomplete plans, and errors were, in fact, corrected by the change order procedure. After the 146 claims in exhibit 11 are decreased by those for which change orders were issued and paid for, and for which timely architect's interpretations were given, there remain 37 disputed claims involving tardy interpretations. These did not involve extra work or material, only delays for which timely claims could have been filed for additional time or costs under sections 8.3.3 and 12.2. Instead, the claims underlying this lawsuit were filed many months after substantial completion of the work and even longer after the alleged delays.[3] As it was, the completion was apparently delayed only about 3 months in all, but the trial court made no effort to assign any of the actual delay in completion to specific causes of delay among the alleged 146. For these reasons, we cannot agree with the court's conclusion that the project was "unreasonably delayed" or with its decision to go outside the contract to

[3]Evidently the closest Mortensen came to making timely claims was to endorse change orders, beginning with No. 68, with the statement: "In signing this change order we are not waiving our rights to any extensions of time or delay costs associated therewith." As we have seen, such rights were covered by procedures outlined in the contract. See pages 721–23.

award damages in quantum meruit. The parties included a clause excluding claims for damages due to delays "beyond the control of the contractor." Such delays as occurred here fit within that clause, and recovery must be denied. *Ericksen v. Edmonds School Dist. 15*, 13 Wn.2d 398, 125 P.2d 275 (1942); *Goss v. Northern Pac. Hosp. Ass'n,* 50 Wash. 236, 96 P. 1078 (1908); *S.L. Rowland Constr. Co. v. Beall Pipe & Tank Corp.*, 14 Wn. App. 297, 540 P.2d 912 (1975).

We hold, in summary, that if owner–caused delay in construction was of a nature contemplated by the parties and specific provisions of their contract provide a remedy, or the contract otherwise supplies a means of compensation for such delay, then the delay cannot be deemed unreasonable to the extent the contract terms should be abandoned in favor of quantum meruit recovery.

The subcontracts between Mortensen and Berg, Henson, and Industrial Electric incorporated all of the prime contract by reference, and the subcontractors were bound to perform according to the contract's terms. The subcontractors' cause of action must rise or fall with that of Mortensen. Our determination that the delays in this project were within the scope of the contract likewise precludes the subcontractors' recovery on the theory that the delays were such that the waiver of damages clause may be overridden.

Judgment reversed and the action is dismissed.

JAMES and CALLOW, JJ., concur.

Petition for rehearing denied August 3, 1977.

Review granted by Supreme Court March 17, 1978.