[No. 21131-5-I.   Division One.   March 5, 1990.]

HENSEL PHELPS CONSTRUCTION CO., *Respondent*, v. KING COUNTY, *Defendant*, SARAH WHITE, ET AL, *Appellants.*

*William A. Helsell, Deborah L. Martin, Charles H. Van Gorder, Richard S. White, Bradley H. Bagshaw,* and *Helsell, Fetterman, Martin, Todd & Hokanson,* for appellants.

*Richard Stanislaw, David C. Burkett,* and *Stanislaw, Ashbaugh, Chism, Jacobson & Riper,* for respondent.

WINSOR, J.—Sarah White and Joseph Steenmeyer, d/b/a Phoenix Painting (Phoenix), appeal from a jury verdict denying them recovery on a claim for compensation based on unanticipated "massive disruption" of the performance of a contract. We affirm.

Phoenix and Hensel Phelps Construction Company (Hensel) entered into a written contract obligating Phoenix to paint the interior and exterior of the 18-story King County Jail for a contract price of $488,415. Hensel was the

general contractor for the construction of the jail. The subcontract agreement between Hensel and Phoenix incorporated the terms of the contract agreement between Hensel and King County, the owner of the facility.

Various problems plagued the construction project and Phoenix's participation in it. Because of delays early in the 20–month construction schedule, Hensel was forced to accelerate the work schedules of subcontractors such as Phoenix whose work was to be performed late in the construction schedule. The original critical path schedule composed by Hensel required Phoenix to complete its work on each floor in 45 days. Because of the accelerated timetable, however, Hensel actually required Phoenix to complete its work on each floor in 19 days.

Another consequence of the accelerated timetable was Hensel's "stacking of trades"[1] in an attempt to timely complete the project. Stacking impacted Phoenix's performance by substantially increasing the amount of touch–up work it performed, due to a large number of tradespeople working in the same area. In addition, the working environment was chaotic, causing work to proceed inefficiently; at points Phoenix had to pull out and wait for a section to be built before its painters could do their work. Finally, Phoenix bid the job intending to spray paint it, but because of the stacking of trades it ended up going through the building a second time brushing and rolling many of the surfaces.

Because of the acceleration, Phoenix had huge cost overruns. Phoenix had originally estimated 9,725 labor hours to complete the project; it actually expended 25,500 labor hours. It also used as many as 26 painters at a time, although it had originally anticipated using a maximum of 9 painters.

The design of the building itself also hampered the painters' efficiency. The jail was designed to prevent escape by omitting any continuous vertical access throughout the

---

[1]"Stacking of trades" refers to the situation of having more than one trade working in a given work area at the same time.

building. Staircases from one floor to the next are positioned at opposite ends of the building; consequently, a worker would have to walk across the entire building floor to go from one staircase to another. The project manager for Hensel estimated at trial that if a subcontractor was required to do work on several floors in one day, "[a]t least 50 percent of the workman's efficiency was lost".

Despite the difficulties it encountered, Phoenix never asked for an extension of time or gave written notice of change of conditions, although such remedies were included in the subcontract. See footnote 5. However, Phoenix presented written claims for extras almost daily, as permitted under the subcontract, and was paid for nearly everything asked—about $120,000.

Hensel began this action to recover damages from King County for various acts and omissions related to construction of the jail. Phoenix was given leave to file a complaint in intervention. Phoenix's complaint sought quantum meruit recovery against Hensel for the full cost it incurred in performing the contract. Specifically, the complaint alleged that extra work and work done out of sequence and schedule so changed the original subcontract that it was abrogated as a matter of law. All claims, except for those of Phoenix, settled in late 1986.

Shortly before trial, Hensel moved to strike Phoenix's quantum meruit claim. The trial judge provisionally granted Hensel's motion, but reserved final ruling to allow Phoenix to produce evidence at trial that supported its quantum meruit theory. On the sixth day of trial the judge granted Hensel's motion, finding that the contractual provisions contemplated remedies for Phoenix's complaints.

At the conclusion of the trial the case was submitted to the jury on a breach of contract theory. The jury returned its verdict in favor of Hensel. From this verdict, Phoenix appeals.

Phoenix first argues that the trial court erred in dismissing the quantum meruit claim because: (1) the jury should decide as a factual issue whether, at the time of contract

formation, the parties contemplated the changed conditions encountered by Phoenix; and (2) Phoenix presented substantial evidence at trial of changed conditions that would warrant giving the question of recovery in quantum meruit to the jury.

When the trial court dismisses a claim as a matter of law, the appellate court views the plaintiff's evidence in its most favorable light and determines whether the trial court correctly applied the law in dismissing the action. *Jones Assocs., Inc. v. Eastside Properties, Inc.,* 41 Wn. App. 462, 465, 704 P.2d 681 (1985).

Quantum meruit is an appropriate basis for recovery when substantial changes occur which are not covered by the contract and are not within the contemplation of the parties, and the effect of such changes is to require extra work or to cause substantial loss to the contractor. *Bignold v. King Cy.,* 65 Wn.2d 817, 826, 399 P.2d 611 (1965). This doctrine is based on the concept of mutual assent and its limits: although a contractor is presumed to be bound by the terms to which he or she has agreed, he or she cannot be presumed to have bargained away his or her right to claim damages resulting from changes the parties did not contemplate at the time of contract formation. *Corinno Civetta Constr. Corp. v. New York,* 67 N.Y.2d 297, 493 N.E.2d 905, 910, 502 N.Y.S.2d 681 (1986).

"The critical factor in application of the [quantum meruit] doctrine is whether the contractor should have discovered or anticipated the changed conditions." *V.C. Edwards Contracting Co. v. Port of Tacoma,* 83 Wn.2d 7, 13, 514 P.2d 1381 (1973). Determination of this factor has *sometimes* been identified by Washington courts as a question of fact. *Edwards,* 83 Wn.2d at 13–14 (whether contractor should have discovered or anticipated Port's delays because of failure to furnish material, failure to make decisions, and interference by other contractors in the right of way are questions of fact); *Bignold,* 65 Wn.2d at 822 (whether contractor should have discovered or anticipated presence of wet subsurface and large boulders a question of

fact); *Tribble v. Yakima Vly. Transp. Co.,* 100 Wash. 589, 595, 171 P. 544 (1918) (jury question whether a change in the line of a railway necessitating use of excess material was beyond the intent of the contract). Sometimes, however, it is regarded as a question of law. *Goss v. Northern Pac. Hosp. Ass'n,* 50 Wash. 236, 238–39, 96 P. 1078 (1908) (trial court properly withdrew from the jury question of recovery of damages for delay, where contract provided remedy for foreseen condition); *Nelse Mortensen & Co. v. Group Health Coop.,* 17 Wn. App. 703, 566 P.2d 560 (1977) (appellate court reversed trial court's finding that hospital project was "unreasonably delayed" such that contractor entitled to receive quantum meruit recovery, where delay was of a nature contemplated by the parties and contract remedy applied), *aff'd,* 90 Wn.2d 843, 586 P.2d 469 (1978); *Tribble, Edwards* and *Bignold* all termed foreseeability a question of fact, but in each of those cases no clause in the contract provided a remedy for the delay–caused damages.

██ After examining the long line of construction cases dealing with quantum meruit recovery,[2] we conclude that the question is one of mixed fact and law. The first step in

---

[2]This line of cases is well summarized in both *Seattle v. Dyad Constr., Inc.,* 17 Wn. App. 501, 510–19, 565 P.2d 423 (1977), and *Mortensen,* 17 Wn. App. at 713–19. In *Dyad,* the court concluded that in delay damages cases in which the contract remedy for owner–caused delay is an automatic extension of time, the general rule is that the contractor is precluded from recovering in quantum meruit because the contingency of the delay had been foreseen and provided for in the contract. *Dyad,* 17 Wn. App. at 517. However, the court noted that the line of appellate cases in this area recognizes that extenuating circumstances may exist which limit application of this rule. Specifically, the court cited the Supreme Court opinion in *Edwards* for the proposition that

> delay clauses are to be strictly construed because of the harsh results that may flow from their enforcement, delays may be so substantial as to be beyond the reasonable contemplation of the parties, and delays may be so large that they devastate the planned cost and time structure upon which the contractor based his bid.

*Dyad,* 17 Wn. App. at 517.

The Court of Appeals made a similar analysis of these cases in *Mortensen,* finding that recovery in quantum meruit was allowed only in those instances in which the contract contained no clause which limited or barred a contractor's claim. *Mortensen,* 17 Wn. App. at 719.

the analysis is for the trial court to decide whether the contract contains any ambiguity from which a trier of fact could reasonably find that the damages or changed conditions were not contingencies contemplated by the parties. If, by looking at the four corners of the document, the court can determine that the contract unambiguously contemplates the changes or disruptions experienced by the complaining party, no issue of fact exists and the quantum meruit claim must be dismissed. If, on the other hand, the provisions are ambiguous, issues of fact would exist, and resolution of the question would be for the trier of fact. *See Spokane Helicopter Serv., Inc. v. Malone,* 28 Wn. App. 377, 382–83, 623 P.2d 727 (1981).

Here, we find no ambiguity in the terms of the contract sufficient to make the question one for the jury. A review of Phoenix's complaints reveals that for each, the contract specified a procedure for remedial relief. The specific complaints were: (1) the design of the building itself hampered the efficiency with which the painters could complete their tasks; (2) Phoenix was forced to accelerate its performance, resulting in uncompensated labor and other cost overruns; (3) Hensel's stacking of trades impacted Phoenix's performance by substantially increasing the amount of work it performed; and (4) Hensel ordered Phoenix to paint areas in which the surfaces were not ready to be painted because other subcontractors had not finished their work.

The first complaint is clearly covered by article 3 of the subcontract.[3] By signing the contract, Phoenix warranted

---

[3] Article 3 states in part:

"Subcontractor acknowledges that it was his responsibility, prior to entering this Subcontract, to investigate and familiarize himself with . . . factors which may affect Subcontractor's work under this Subcontract. The Subcontractor hereby warrants and agrees that he has investigated all such matters and familiarized himself therewith to the extent that he, in his sole discretion, deems necessary. Subcontractor further agrees that Contractor shall not be liable to Subcontractor on any claim for additional payment or additional time or any claim whatsoever if such claim directly or indirectly results from Subcontractor's failure to investigate and familiarize himself sufficiently with the conditions under which this Subcontract is to be performed . . .".

that it had studied the layout of the jail and made its bid after doing the research it deemed necessary. Under the express terms of the contract, the parties contemplated the possibility that site conditions would affect Phoenix's work. Further, Ms. White testified that Phoenix had considered the access problems when it put its bid together. Phoenix had access to the plans, and may not now complain that the design of the building hampered its efficiency.

The second complaint, acceleration of the work schedule, is a contingency covered by article 16 of the subcontract.[4] Article 16 plainly contemplates that Hensel could make changes in the work as contracted and directs Phoenix to complete the work as modified by Hensel. Thus, that Hensel had originally scheduled Phoenix at 45 days per floor but later changed the time to 19 days per floor was a contingency covered by the contract. Similarly, the fact that Phoenix had to hire more painters than it originally anticipated (because of the reduced time for performance) is also covered by the contract. Article 16 also allows Phoenix to seek an equitable adjustment to cover changes in cost of performance. Phoenix could have submitted its cost overruns to Hensel. It did not. The provision is unambiguous, and covers the acceleration of performance.

The third complaint, that the stacking of trades was not contemplated by the contract, is a contingency covered by articles 15, 16, 17 and 21 of the subcontract and article 14 of the general contract.[5] Stacking trades at the worksite

---

[4]Article 16 provides:

"Contractor may at any time, by written order and without notice to surety, make changes in the work herein contracted for and Subcontractor shall proceed with the work as directed. If said changes cause an increase or decrease in the cost of performance or in the time required for performance an equitable adjustment shall be made and this subcontract shall be modified in writing accordingly. Nothing herein contained shall excuse the Subcontractor from proceeding with the prosecution of the work as changed."

[5]Article 15 provides in part:

[T]he Subcontractor agrees to notify the Contractor of his objection to, or inability to comply with, any directive, notification, order, schedule or revision thereof dealing with the time or times of his performance hereof, and to do so

resulted in changed conditions on the jobsite, forcing Phoenix to work more slowly and inefficiently than it had originally estimated. Article 17 specifies that a subcontractor

within three days of Contractor's issuance thereof. In absence of such notice within three days the Subcontractor agrees to accept for incorporation herein any and all orders, notices, directives, schedules or revisions thereof which may herewith and/or hereafter be issued from time to time by the Contractor to Subcontractor at Subcontractor's last known address or through his representative at the site of the work, and in the event of any conflict between the requirements of any of the foregoing. . . .

Article 17 provides:

The Subcontractor agrees to make any claims to the Contractor for damages or additional compensation based on alleged extra work, changed conditions or any other grounds in the same manner as provided in [article 14 of the general contract], and in such times as will enable the contractor to present such claims to the Owner for payment or recognition; and the Contractor will not be liable to the Subcontractor on account of any claim not timely or properly presented, nor unless and until it is allowed by the Owner. Notwithstanding anything to the contrary contained herein, no interruption, cessation, postponement or delay in the commencement of the work or in the progress thereof from any cause whatsoever, including disputes, shall relieve the Subcontractor of its duty to perform or give rise to any right to damages or additional compensation from the Contractor except to the extent that reimbursement is received from the Owner by the Contractor therefor with respect to the work to be performed by Subcontractor hereunder, and the Subcontractor hereby expressly waives and releases any other or further right to damages or additional compensation.

If the Subcontractor encounters surfaces or work which he considers unsatisfactory and which affect the work under this Subcontract, or if the Subcontractor encounters any other condition whatsoever upon which he may base a claim for extra compensation, extra time, or any other type of claim, it shall be his duty to give written notice to the Contractor prior to commencing any work involving said conditions in order to allow the Contractor to inspect said conditions and to make such arrangements and take such steps as Contractor deems necessary. In the absence of such notice to the Contractor, Subcontractor shall be fully and solely responsible and liable for any and all expense, loss, or damage resulting from said condition and Contractor shall be relieved of all liability in connection therewith.

Article 14 of the general contract, referenced by article 17, allows the owner to make order extra work and make change orders. It also contemplates a procedure for the contractor to follow should he or she encounter subsurface and/or latent conditions at the site materially differing from the original plan. The provision contemplates payment for work or time extension from either of these causes, but provides in part:

Payment for work or time extension pursuant to a change order as provided in this Article, other than deleted work, shall be full compensation for any such changes, including payment for costs of all delays in connection with

may claim damages for changed conditions in the same manner as provided in article 14 of the general contract. Article 14 allows the subcontractor to claim damages or equitable adjustment for changes ordered by the owner or for unexpected changed conditions. Article 17 also requires that the subcontractor give written notice of any condition upon which he may make a claim for additional compensation.[6] In addition, under article 21, Phoenix agreed to protect all surfaces already painted and do touch–up work when necessary. If Phoenix felt it was doing excessive touch–up work, it could have made an article 17 claim.

Finally, Phoenix's complaint that it was ordered to paint surfaces that were unready is expressly covered by article 17. See footnote 5. Article 17 states that a subcontractor

---

such change and including full payment for any expense or inconvenience, disruption of schedule and/or loss of efficiency or productivity by the Contractor and/or such forces.

Article 21 provides in part:

It is understood and agreed that the work provided for in this Subcontract constitutes only a part of the work being performed on this project for the Owner by the Contractor and other subcontractors. The Subcontractor therefore agrees to perform the work called for in this Agreement in such a manner that he will not injure or damage any other work performed by the Contractor or any other subcontractor, and Subcontractor further agrees as follows, to wit:

(a) To furnish continuous and effective protection at all times for his own work in place and all materials stored for use under this Subcontract, and to bear and be solely liable for all loss and/or damage of any kind to or in connection with said work and materials at any time prior to the final completion and acceptance thereof, unless said loss or damage is caused solely by the negligence of the Contractor . . ..

[6]At oral argument, Phoenix claimed that both article 14 and article 17 violate RCW 4.24.360, which declares void and unenforceable any construction contract provision that purports to release or waive damages caused by delay. This argument is misplaced. The release provision in article 17 only concerns claims based upon acts of Hensel. Even if that provision were void, Phoenix's claims are not affected, as they are all based upon acts of King County, the owner. Article 17 does not purport to waive, release, or extinguish Phoenix's right to damages or equitable adjustment based upon acts of King County; it only requires that Phoenix give Hensel notice of such damages before the right to compensation accrues. Similarly, article 14 of the general contract does contemplate an equitable adjustment for changes ordered by the owner and for unexpected changed conditions.

may make a claim for extra compensation based on "surfaces or work which he considers unsatisfactory and which affect the work under this Subcontract." See footnote 5.

Phoenix knew how to use these clauses in the contract for extras: it filled out written claims for extras on a nearly daily basis and received $120,000 in extra compensation, nearly one–quarter of the amount of the total contract price. Hensel paid Phoenix virtually all the extra compensation it thereby requested. Phoenix could have sought recovery for its present complaints using the same clauses as it did to recover for extras. We conclude that all of the damages asserted by Phoenix were contemplated by the contract.

Phoenix makes two further arguments in support of its contention that it presented substantial evidence to support quantum meruit recovery. They are: (1) that the magnitude of the delay and disruption shown was sufficient to send this claim to the jury; and (2) that the disruption represented a "substantial or cardinal change" sufficiently beyond the scope of the contract to invoke quantum meruit recovery.

A. Magnitude of Delay.

Phoenix argues that the magnitude of delay in this situation was greater than in other cases in which the court has awarded quantum meruit damages. *See Lindbrook Constr., Inc. v. Mukilteo Sch. Dist. 6,* 76 Wn.2d 539, 458 P.2d 1 (1969) (allowing quantum meruit recovery where time to complete performance doubled); *Bignold v. King Cy., supra* (allowing quantum meruit where cost of performance increased 50 percent).

Hensel responds that the focus of the inquiry should be whether the *types* of changes were covered by the contract, not the degree of variation in job conditions from what was originally relied upon in the bid. We agree with Hensel.

*Mortensen,* a construction contract case very similar to this one, is instructive. *Mortensen* involved a contractor who remodeled and constructed hospital additions for a contract price of over $6 million. The contract contained a

provision that limited the contractor's remedy for delay to an extension of time. The contractor sought recovery in quantum meruit for delay caused by the owner.

After a bench trial, the court ruled that the hospital and its architect caused delay to the contractor so substantial and unreasonable that it was outside the contemplation of the parties at the time of contract formation. *Mortensen,* 17 Wn. App. at 706. Accordingly, the trial court awarded over $600,000 in damages. The Court of Appeals examined the findings of fact made by the trial court, and disagreed with its holding that the contract did not cover the delay:

> We hold, in summary, that if owner–caused delay in construction was of a nature contemplated by the parties and specific provisions of their contract provide a remedy, or the contract otherwise supplies a means of compensation for such delay, then the delay cannot be deemed unreasonable to the extent the contract terms should be abandoned in favor of quantum meruit recovery.

*Mortensen,* 17 Wn. App. at 727.[7] The court focused on the *nature* of the delay, not the magnitude.

The fact that Phoenix used nearly three times the amount of labor hours to perform its contract obligations, or that it used 26 painters instead of 9, is irrelevant. As long as the nature of the problems encountered was contemplated by the contract, and we hold that is so, there

---

[7]*Mortensen* contains other language that seems to contradict this holding. The Court of Appeals opinion includes the somewhat confusing statement that:

> As the foregoing analysis demonstrates, the sort of delays for which damages were awarded by the trial court were contemplated by the contracting parties and should be controlled by the contractual remedies, *unless the delays can be said to be so excessive and unreasonable as to fall outside the scope of the contract and warrant an additional recovery in quantum meruit.*

(Italics ours.) *Mortensen,* 17 Wn. App. at 726.

This language suggests that there is a point at which the amount of damages becomes so excessive that recovery in quantum meruit should be allowed, even if the nature of the delays is contemplated by the contract. However, the Supreme Court, in affirming the opinion, eliminated the ambiguity in the Court of Appeals opinion. By singling out and quoting the paragraph of the Court of Appeals opinion contained in the text above, the Supreme Court emphasized that the correct test is whether the kind of delay was within the contemplation of the parties, not whether the delay itself was unreasonable. *Mortensen,* 90 Wn.2d at 845. Thus, the *nature* of the delay is the correct focus of inquiry, not the magnitude of the delay.

is no basis to abandon the contract in favor of quantum meruit.

B. Cardinal Change.

Phoenix's second argument is that under the "cardinal change doctrine", Phoenix should be allowed to recover in quantum meruit because there has been a fundamental alteration of the contract beyond its original scope. *See Air–A–Plane Corp. v. United States,* 408 F.2d 1030 (Ct. Cl. 1969).

In *Air–A–Plane,* the Court of Claims explained the basic standard of the cardinal change doctrine: whether the modified job is essentially the same work as the parties bargained for when the contract was awarded. A plaintiff will have no right to recover if the project as ultimately constructed is essentially the same as the one it contracted to construct. *Air–A–Plane,* 408 F.2d at 1033. Nonetheless, the court cautioned that there is no exact formula, and the court must look to the magnitude as well as the quality of the changes involved.

This case does not involve the magnitude of changes that existed in the federal cases cited by Phoenix. *See Air–A–Plane Corp. v. United States, supra* (in a contract to construct airline hangar, where a hangar collapsed due to allegedly faulty government specifications and government ordered contractor to reconstruct hangar, contractor entitled to trial on cardinal change claim); *Edward R. Marden Corp. v. United States,* 442 F.2d 364, 370 (Ct. Cl. 1971) (in a contract to construct 1,100 generators, where government ordered numerous changes in design and specifications of generator during its construction, contractor had right to trial on cardinal change claim); *Saddler v. United States,* 287 F.2d 411 (Ct. Cl. 1961) (large increase in earthwork due to change in levee specifications held cardinal change falling outside scope of contract).

In contrast, Phoenix's complaints concern having to work on an accelerated schedule, having to redo work, and contending with the stacking of trades. None of these

complaints reflects a fundamental alteration of the project; there was not the slightest change in the shape or square footage of surfaces painted.

In sum, the contract contains remedial provisions that cover the kinds of contingencies Phoenix encountered. Thus, the trial court did not err in dismissing the quantum meruit claim as a matter of law. Although Phoenix did suffer enormous damages, it did not choose to follow the contractual provisions for redress.

The judgment of the trial court is affirmed.

The remainder of this opinion has no precedential value. Therefore, it will not be published, but has been filed for public record. *See* RCW 2.06.040; CAR 14.

COLEMAN, C.J., and SCHOLFIELD, J., concur.