[No. 10303.    Department Two.    July 17, 1912.]

KNICKERBOCKER COMPANY, *Appellant*, v. THE CITY OF SEATTLE, *Respondent*.[1]

MUNICIPAL CORPORATIONS—BRIDGES—POWER TO CONSTRUCT. Rem. & Bal. Code, § 7507, authorizing a city to open, establish, grade and plank streets and other public places, and to construct and keep in repair bridges, authorizes the city to construct a bridge or elevated roadway.

SAME—BRIDGES—WHAT CONSTITUTES. An elevated roadway resting on mudsills and stringers, built to bring the street up to the established grade is not a bridge.

SAME—NATURE OF IMPROVEMENT—TEMPORARY OR PERMANENT. An elevated roadway resting on mudsills, piles and stringers, is a "permanent" improvement for which the property may be assessed, where it was intended to use the same as long as it would last,

[1]Reported in 124 Pac. 922.

although the city contemplated the making of a permanent fill later, and did in fact commence filling in underneath the structure shortly after it was built.

SAME—IMPROVEMENTS—BENEFIT—OFFSET OF DAMAGES. Damage to abutting property by reason of previous improvements cannot be offset against an assessment for benefits from a later improvement.

Appeal from a judgment of the superior court for King county, Myers, J., entered December 19, 1911, confirming an assessment for a local improvement, upon appeal from the city council. Affirmed.

*Charles A. Riddle,* for appellant.

*James E. Bradford* and *J. Richard Dillon,* for respondent.

FULLERTON, J.—The appellant owns real property situated in the city of Seattle which abuts upon Maynard avenue therein. By Ordinance No. 19,235, the city caused that part of Maynard avenue in front of and in the vicinity of the appellant's property to be improved at the expense of the property benefited, and caused a part of the cost thereof to be assessed upon appellant's property as property so benefited. The appellant protested before the city council at the proper time against the assessment, but the protest was overruled by that body and the assessment allowed to stand. The appellant thereupon appealed from the order to the superior court, where the assessment was again confirmed. The present appeal was taken from the judgment and order of the superior court.

The character of the improvement is what the engineer in charge denominated bridge work. It consisted of an elevated roadway, constructed in part upon posts resting on mudsills, and in part upon piles driven in the ground; the posts and piles being surmounted by capping or stringers, and the whole overlaid with planks.

The record discloses that the appellant's lots have been affected by some four other regrade and improvement projects, all had prior to the improvement in question. In the first of these, known as Jackson street regrade, a grade was

established in front of the appellant's property at 34.50 feet above the city datum line. The second raised this grade to 40.09 above the datum line. The third provided for an improvement known as the sanitary fill, by which the lots of the appellant were required to be filled up to a certain grade so that proper sewerage connections could be made therewith; the natural grade of the lots being so low that sewerage could not be made to flow therefrom without the use of pumps. The fourth provided for filling the street underneath the bridge work with earth up to the 40.09 foot level. At the time of the Jackson street regrade, there was a two-story brick building upon the appellant's property which then had a considerable rental value, and which was not entirely destroyed by that regrade. The subsequent change in the grade, together with the sanitary fill and the earth fill beneath the bridge, have so far destroyed the usefulness of the building as to require its demolition. For the injuries that were caused the property by these improvement projects, save only for the Jackson street regrade, no award was made the appellant, nor were any proceedings instituted to determine whether or not such projects caused injuries which exceeded the benefits conferred on the property by the improvements.

The appellant calls the structures which the city erected in the street a bridge, and contends that the city was without power to charge the cost thereof to the property benefited; since, as it contends, neither the city charter nor the general statutes furnish warrant or authority for constructing a bridge. But it has seemed to us that this contention is not well taken. Both the general statute (Rem. & Bal. Code, § 7507) and the charter of the city of Seattle (art. 4, §·18) provide that the city shall have power:

"Seventh. To lay out, establish, open, alter, widen, extend, grade, regrade, sidewalk, residewalk, pave, repave, plank, replank, establish grades or otherwise improve streets, alleys, avenues, sidewalks, wharves, parks and other public

grounds, and to regulate and control the use thereof, and to vacate the same and to authorize or prohibit the use of electricity at, in or upon any of said streets or for other purposes, and to prescribe the terms and conditions upon which the same may be so used and to regulate the use thereof . . .

"Tenth. To provide for making local improvements and to levy and collect special assessments on property benefited thereby, and for paying for the same or any portion thereof.

"Twelfth. To construct and keep in repair bridges, viaducts and tunnels, and to regulate the use thereof.

"Thirteenth. To determine what work shall be done or improvements made at the expense in whole or in part of the owners of the adjoining, contiguous or proximate property, or others especially benefited thereby, and to provide for the manner of making and collecting assessments therefor."

The city charter also contains the further provision, namely:

"Whenever the public interest or convenience may require, the city council is hereby authorized and empowered to order the whole or any part of the streets, lanes, alleys, squares or places of the city to be graded or regraded to the official grade, planked or replanked, paved or repaved, macadamized or remacadamized, graveled or regraveled, piled or repiled, capped or recapped, and to order sidewalks, sewers, manholes, culverts, bulkheads, retaining walls, watermains, curbing and crosswalks to be constructed or repaired therein; and to order any and all work to be done which shall be necessary to complete the whole or any portion of the said streets, lanes, alleys, squares or places; and the city council may levy and collect an assessment upon all lots or parcels of land specially benefited by such improvements to defray the whole or any portion of the cost and expense thereof, which assessment shall become a first lien upon all property, liable therefor, prior and superior to all other liens and incumbrances." Charter, art. 8, § 11, subd. 1.

The statute also further provides:

"Whenever any local improvement is hereafter ordered in any incorporated city of the first class in this state, the cost of which is payable in whole or in part by an assessment upon the property abutting or proximate thereto, a like proportion of the cost of that portion of said improvement included with-

in the limits of any street intersection space or spaces, shall be included in the amount of total cost to be assessed and levied upon and collected from the property included within the local improvement district established for the purpose of providing for the cost of such local improvement.  For the purposes of this and the next section, any improvement made, either upon or under the surface of any street, avenue, alley, square or other public place, the cost of which is payable, in whole or in part, by an assessment upon the property abutting or proximate thereto, shall be deemed to be a local improvement." Rem. & Bal. Code, § 7529.

The quotation first made from the statute and charter of the city would seem to confer on the city ample authority to erect the structure in controversy, even though we were to concede that the structure was in reality a bridge.  See the twelfth subdivision thereof.  But the structure is clearly not a bridge in the common acceptation of that term.  A bridge is "a structure erected over a river or other water course, or over a chasm  .  .  .  to make a passage way from one bank to the other; anything supported at the ends which serves to keep some other thing from resting upon the object spanned .  .  .  .  or which forms a platform or staging over which something passes or is conveyed;" while the present structure was merely intended to bring the surface of the street up to the established grade.  It is no more a bridge proper than it would have been had the street been filled with earth to the required level and the top planked over.  It was an elevated roadway; and as such, ample power is found in the sections of the city charter and statutes above quoted to authorize its construction at the expense of property benefited thereby. *Vreeland v. Tacoma*, 48 Wash. 625, 94 Pac. 192; *Smith v. Seattle*, 25 Wash. 300, 65 Pac. 612.

It is next contended that the improvement was but temporary in character, intended to serve as a roadway only until such time as an earth fill, which was carried on concurrently with the improvement, could be completed; and that the law does not permit an assessment upon property bene-

fited to pay the cost of mere temporary improvements.   But
in our opinion the evidence does not warrant the conclusion
that the structure was for temporary use only.   It may be
true that, when the structure was ordered, the city officials
contemplated making a permanent fill along the line of the
structure; but the evidence makes it clear that the structure
was intended to constitute the roadway as long as it could
be safely used for that purpose.   There was no intention of
substituting new materials or a new character of roadway
until the use and decay rendered the particular one inade-
quate or unsafe.   It was permanent, therefor, in the sense
that it was intended for use as long as the materials of which
it was composed would last, and this makes it permanent in
a legal sense.   It is true, the evidence shows that the city
began to fill underneath and surrounding the structure with
earth shortly after it was constructed, and has since prac-
tically completed the fill, rendering a rebuilding of a similar
structure unnecessary, but this was done at the expense of a
public service corporation which had acquired rights in an-
other street, not at the expense of the property benefited by
the fill.   However, had it been made at the expense of the
city, it would not prove the first improvement to be tem-
porary instead of permanent.

It is finally contended that the damage to the appellant's
property caused by the improvement is in excess of the bene-
fits conferred; but here again we think the evidence fails to
support the contention.   As we understand the witnesses,
they did not testify that the particular structure caused
damage to the appellant's property; but, on the contrary,
testified that the damage resulting to the property was
caused by the last change in the grade, and by the fills fol-
lowing that change of grade; that is to say, by the raise of
the grade from 34.50 feet above the city datum line to 40.09
feet, the sanitary fill, and the fill underneath the bridge work.
But this damage, being the result of proceedings other than
the one now before us, cannot be offset against benefits con-

ferred by this proceeding. Proceedings of this sort are special and not general; hence the statutes allowing offsets and counterclaims to be pleaded in defense have no application. Such a practice would deny to the city·the benefit of the provisions of its charter requiring claims for damages to be presented to its city council for allowance or rejection prior to the maintenance of an action thereon, and would so confuse and intermingle its several improvement projects as to render that means of improving streets impracticable. We find nothing in the current proceedings that successfully impeaches the assessment roll, and this is as far as we are permitted to inquire.

The judgment appealed from will stand affirmed.

ELLIS, MORRIS, and MOUNT, JJ., concur.