[No. 6440-5-II.   Division Two.   March 14, 1985.]

DONALD B. MURPHY CONTRACTORS, INC., *Appellant,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

*Geoffrey P. Chism* and *Sarah Weaver,* for appellant.

*Kenneth O. Eikenberry, Attorney General, Thomas R. Garlington, Senior Assistant,* and *John W. Hough, Assistant,* for respondents.

PETRICH, J.—Plaintiff Donald B. Murphy Contractors, Inc. (DBM), after a trial to the court, appeals from the judgment which held the State of Washington free from liability for "impact costs" for repairs and reconstruction on two highway construction projects damaged by flood-

waters, as well as impact costs for various change orders and stop work orders on the projects.

The issues on appeal are:

1. Whether the State's plans and specifications of certain culverts which were unable to handle the excess flow of water were in breach of the State's implied warranty of design.

2. Whether the "changed conditions" clause of the contracts, which entitled the contractor to an equitable adjustment for unanticipated site conditions, may be invoked by unusual weather conditions encountered during the course of construction.

3. Whether portions of the project damaged by the floodwaters were temporary work with consequence that the risk of loss was on the contractor rather than the State.

4. Whether the contractor is entitled to indirect or impact damages due to delays arising from various change orders and stop work orders issued by the State.

5. Whether statements by certain employees of the State were properly excluded because they were hearsay and not admissions under ER 801(d)(2).

We affirm.

In 1975, DBM contracted with the State to build two highway construction projects, Nos. 9840 and 9973. The two contracts provided for the construction of new adjoining sections of Interstate 90 just east of Issaquah, Washington. Both projects were similar in nature. They called for construction of new traffic lanes, building new bridges, demolishing old bridges, and constructing several detours. Heavy rain in early December 1975 damaged both projects and gave rise to the present dispute.

The State provided all plans, designs, and specifications for both projects. Contract 9840 included changing the course of East Issaquah Creek by diverting the creek through a 96–inch steel culvert under the existing freeway. Contract 9973 included installing another 96–inch steel culvert in the creek bed to serve as a detour while a bridge was demolished and replaced. Both culverts were in place on

December 2, 1975.

After several days of heavy rain and the melting of snow, East Issaquah Creek reached flood stage on December 2 and 3, 1975. The flow of water in the creek during these 2 days peaked at the highest volume ever recorded. In addition to the tremendous flow of water, the flood carried a significant amount of debris. In order to save property owners and work downstream, the State ordered DBM to excavate the culvert on No. 9840 late in the night of December 2, 1975. The pressure behind the remaining culvert on No. 9973 caused the culvert to fail and wash downstream on December 3, 1975.

Pursuant to change orders, the State paid DBM for the direct cost of replacing the culvert in No. 9973 in a substantially modified form, as well as the direct cost of numerous other change orders and stop work orders. Many, but not all, of the orders were issued to remedy the problems caused by the failure of the culverts. DBM sought to recover damages stemming from the indirect or impact costs attributed to the delays caused by the flood damage as well as additional compensation for delay attributable to change orders not directly related to the flood damage. According to DBM the impact cost of the culvert failures and subsequent change orders and stop work orders totaled $662,192. DBM contended at trial[1] that the State was liable as a matter of law (1) for the breach of its implied warranty of design because the specified culverts were inadequate to handle the flow of water in the creek experienced on December 2 and 3, (2) under the "changed conditions" clause of the contract, which entitles the contractor to an equitable adjustment for unanticipated site conditions, and (3) under the "changes" clause of the contract for the impact costs arising from the State's change orders and stop work orders.

We consider first DBM's contention that the

---

[1]The case was bifurcated as to liability and damages. The trial court below considered only the issue of liability.

State breached its implied warranty of design because the culverts failed to handle the floodwaters of December 2 and 3, 1975. By furnishing the designs and specifications calling for the 96-inch culverts, the State warrants by implication that the designs are "sufficien[t] for the purpose in view." *Prier v. Refrigeration Eng'g Co.,* 74 Wn.2d 25, 29, 442 P.2d 621 (1968). Here, the trial court found that the designs for the culverts met a reasonable design standard and failed only because of an unprecedented flood—an act of God—and concluded, therefore, that the State had not breached the implied warranty of design. DBM fails either to assign error to all of the court's findings upon this issue or to set forth verbatim the findings it challenges. Therefore, the court's findings are verities on appeal. *Thomas v. French,* 99 Wn.2d 95, 659 P.2d 1097 (1983); *Hindquarter Corp. v. Property Dev. Corp.,* 95 Wn.2d 809, 631 P.2d 923, 23 A.L.R.4th 897 (1981).

However, DBM contends that the reasonableness of the culverts' design is irrelevant and that the failure of the culverts is a breach of the implied warranty of design as a matter of law and renders the State strictly or absolutely liable for the flood damage.

We disagree with DBM's contention that the implied warranty of design is the equivalent of strict or absolute liability. As noted above, Washington law requires only that the design be sufficient for the intended purpose. *Prier v. Refrigeration Eng'g Co., supra.* Further, the main case cited by DBM in support of its contention, *United States v. Spearin,* 248 U.S. 132, 63 L. Ed. 166, 39 S. Ct. 59 (1918), holds only that a design must be "defective" for there to be a breach of the implied warranty. Later federal cases which have applied *Spearin* have stated that under the implied warranty of design, the owner warrants only that if the design is followed, a satisfactory result will follow. *See, e.g., Hol-Gar Mfg. Corp. v. United States,* 360 F.2d 634 (Ct. Cl. 1966). Moreover, in *Praxis-Assurance Venture,* 81-1 B.C.A. ¶ 15,028 (Armed Servs. 1981), it is stated at page 74,357:

It is unrealistic, at least insofar as this type of work is concerned, to expect and demand that the design be prepared so as to cover the worst possible circumstances. The law only mandates that the design be adequate to handle the normal circumstances which history and experience has shown can reasonably be expected to be encountered. The drainage system in being at the time of the award of this contract met that requirement. Appellant has no right to demand more.

Thus, we believe that because the design for the culverts was reasonable, as found without challenge by the trial court, the State did not breach its implied warranty of design. We note further in this regard that neither implied warranties under the U.C.C. nor products liability cases provide a strict liability standard. *See, e.g., Tallmadge v. Aurora Chrysler Plymouth, Inc.,* 25 Wn. App. 90, 605 P.2d 1275 (1979) (U.C.C.: merchantable does not mean perfect); *Lamon v. McDonnell Douglas Corp.,* 19 Wn. App. 515, 576 P.2d 426 (1978), *aff'd and remanded,* 91 Wn.2d 345, 588 P.2d 1346 (1979) (products liability: test is whether product is unreasonably dangerous).

We next address DBM's contention that the trial court erred as a matter of law by concluding that the heavy rains of December 2 and 3, 1975, did not constitute a "changed condition." Section 1.04.7 of the contract provided that DBM was entitled to an equitable adjustment in the contract price for "changed conditions." In construing such "changed conditions" provisions, courts generally allow recovery for additional costs when the condition complained of "could not reasonably have been anticipated by either party to the contract." *Bignold v. King Cy.,* 65 Wn.2d 817, 821–22, 399 P.2d 611 (1965). DBM argues that if the flooding "could not reasonably have been anticipated" by the State for the purpose of determining that the implied warranty of design was not breached, then a "changed condition" must be found to exist under the *Bignold* holding. It is a well established principle, however, that changes in site conditions caused by weather occurring after work on a project has started do not constitute

"changed conditions." *Arundel Corp. v. United States,* 103 Ct. Cl. 688, *cert. denied,* 326 U.S. 752 (1945); Annot., *Construction and Effect of a "Changed Conditions" Clause in a Public Works or Construction Contract,* 85 A.L.R.2d 211, § 9 (1962); 4A J. McBride & I. Wachtel, *Government Contracts* § 29.90 (1984).

DBM contends that the heavy rainfall *combined* with the inadequate culverts constitutes a changed condition, relying upon *Phillips Constr. Co. v. United States,* 394 F.2d 834 (Ct. Cl. 1968). In *Phillips,* the contractor was permitted to recover under the changed conditions clause because the project had flooded numerous times due to an inadequate government drainage system. However, in *Phillips* the drainage system was found to be inadequate to handle even normal rainfall, whereas here the trial court's unchallenged finding is that the culverts were in excess of a reasonable design standard, and therefore were more than adequate to handle normal rainfall or other reasonably anticipated conditions.

A situation similar to the present case was addressed in *Praxis–Assurance Venture, supra.* There, a contractor sought additional compensation under the contract for damage due to unusually heavy rainfall combined with inadequate drainage facilities. In ruling against the contractor's changed conditions claim, the board found that the heavy rainfall was an act of God, but that the drainage system was adequate to handle normal rainfall.

> The appellant fails to recognize the fact that virtually any site, if subjected to enough heavy rain, will temporarily flood and that such flooding normally causes damage. Construction contractors bear the additional cost of such losses that are caused by the acts of God. *The appellant presented no evidence establishing that the site was subject to flooding during periods of normal rainfall.* In contrast, the Government established that the flooding that occurred at the site was the result of exceptionally heavy and unusual rainfall, . . .

*Praxis,* 81–1 B.C.A. at 74,357. We agree with the trial court that, because the culverts were adequately designed for

reasonably anticipated conditions, the heavy flooding caused by heavy rain alone does not constitute a changed condition under the contract.

DBM next contends that the trial court erred in concluding that the work damaged was temporary work. Section 1–07.13 of the contract provides that damage to either permanent or temporary work shall be repaired at the contractor's expense except for damage to permanent work by flooding or other acts of God. Thus, the court's conclusion that the work damaged was temporary work, not permanent, means that the risk of loss to such work remains with DBM under the contract. Generally, a contractor bears all risk of loss on a project until it is completed and accepted by the owner. *United States v. Spearin, supra.* Neither party to a construction contract is liable to the other for acts of God, unless liability is expressly assumed. *De Armas v. United States,* 70 F. Supp. 605 (Ct. Cl. 1947). Here, the State expressly assumed liability for damage to permanent work caused by flood or other acts of God, but the risk of loss for damage to temporary work remained with DBM.

DBM contends that such an interpretation of section 1–07.13 negates the State's implied warranty of design because DBM becomes liable for damage to temporary work, even if the damage is due to a breach by the State of its implied warranty of design. This contention fails because the trial court properly concluded that the State had not breached its implied warranty of design. Thus, in this case, the implied warranty is not negated.

DBM next contends that the work damaged was permanent and not temporary. Because the culverts were only adequate to handle a 5–year flood, DBM argues that each culvert "was permanent . . . in the sense that it was intended for use as long as the materials . . . would last, and this makes it permanent in a legal sense", citing *Knickerbocker Co. v. Seattle,* 69 Wash. 336, 341, 124 P. 920 (1912). Alternatively, DBM maintains that even if the culverts were temporary, the damage from failure of the culverts was to permanent work downstream. Lastly, DBM

asserts that all work specified and required by the State should be found to be permanent work. We find that these contentions fail. We disagree that *Knickerbocker Co. v. Seattle, supra,* requires a holding that the culverts were permanent structures under the contract. In holding an elevated roadway to be "permanent in the legal sense," the court stated:

> [T]he evidence makes it clear that the structure was intended to constitute the roadway as long as it could be safely used for that purpose. There was no intention of substituting new materials or a new character of roadway until the use and decay rendered the particular one inadequate or unsafe.

*Knickerbocker,* 69 Wash. at 341. Here, the State did not intend to use the temporary culverts until use and decay rendered them inadequate or unsafe. Rather, the State clearly intended to use these culverts only as temporary detours while completing the permanent sections to the I–90 freeway project. The other cases cited by DBM we find equally unhelpful.

We also disagree with DBM's contention that, even though the culverts are temporary, the State is liable to DBM for damage to permanent work downstream caused by the failure of the temporary culverts. DBM admits it has been already paid for all of the direct costs attributable to repairing the damage to work that both parties agree was permanent. However, in addition to the direct costs, DBM seeks to recover costs solely attributable to the delay in completing the overall project caused by the failure of the culverts. As discussed above, the culverts are temporary and, under the contract, the State is not liable for damage to temporary work, including the delays caused by such damage.

We further disagree with DBM's contention that the State's providing the plans for the temporary culverts makes the work permanent. This appears to be just another version of DBM's contention that the State breached its implied warranty of design. Moreover, the trial court heard

extensive testimony and was well briefed on this issue. The trial court found as a matter of fact that the culverts were temporary. DBM fails to challenge this factual finding, and it therefore is an established fact in the case. *Goodman v. Bethel Sch. Dist. 403,* 84 Wn.2d 120, 524 P.2d 918 (1974).

DBM contends next that the trial court erred in failing to award damages under the State's numerous change orders and stop work orders. DBM asserts that although the State paid for the direct costs of the orders, DBM was not compensated for the indirect or impact costs attributable to delays caused by the orders, nor was its remedy for the delays limited under the contract only to extensions of time in which to complete the contract. DBM contends further that the trial court failed to address the State's liability under the change work and stop work orders. Lastly, DBM contends that the State's claim that the "no damage for delay" provision in the contract controls and its claim of accord and satisfaction are both affirmative defenses which the State failed to plead properly. We disagree.

■ As noted above, under section 1–07.13 the risk of loss on the project remains upon DBM until acceptance by the State, except to the extent that an act of God may damage permanent work already performed by DBM. Under the contract, neither party is liable to the other for delays due only to adverse weather. Under section 1–08.8 of the contract, the only remedy available to DBM for weather–caused delays is an extension of time in which to complete the contract. *Nelse Mortensen & Co. v. Group Health Coop.,* 17 Wn. App. 703, 566 P.2d 560 (1977), *aff'd,* 90 Wn.2d 843, 586 P.2d 469 (1978). The fact that section 1–08.8 of the contract does not contain an explicit "no damage for delay" clause does not require a different result.

> [W]here the probability of the happening of the condition has been foreseen and a remedy is provided for its happening, the presumption is that the parties intended the prescribed remedy as the sole remedy for the condition, and this presumption is controlling where there is nothing in the contract itself or in the conditions sur-

rounding its execution that necessitates a different conclusion. *Goss v. Northern Pac. Hosp. Ass'n,* 50 Wash. 236, 239, 96 P. 1078 (1908); *see Nelse Mortensen,* 17 Wn. App. at 719, 727. Here, the contract is clear that the probability of delays caused by the State's issuance of change work or stop work orders was foreseeable. The contract also provides a remedy of a time extension whenever the State issued such orders. Thus, the presumption is that a time extension is the sole remedy for DBM under the contract for delays due to State–issued change work or stop work orders. *Goss v. Northern Pac. Hosp. Ass'n, supra; Nelse Mortensen & Co. v. Group Health Coop., supra.* Further, both the "no damage for delay" and "accord and satisfaction" defenses were raised and extensively briefed to the trial court in supplementary briefs. Finally, the trial court explicitly addressed this issue, specifically finding (1) the State had fully performed its obligations under the terms of the contract, and (2) there is no liability on the part of the State in this action. The trial court properly ruled on DBM's claims for damages attributable to the State's change and stop work orders by finding that the State had met all its contractual obligations.

DBM's final contention is that the trial court erred in excluding testimony of Donald Morin and Donald B. Murphy, both principals of the corporate litigant, DBM, regarding alleged admissions of liability made to them by agents for the State. The court excluded the testimony on the grounds that (1) the statements were hearsay, and (2) the statements were not admissions within the meaning of ER 801(d)(2) because the State's agents were not "speaking agents." DBM contends that the statements were not hearsay because they were not offered to show the truth of the matter asserted, but instead were offered to show the "operative facts" of the contract. Alternatively, DBM asserts that even if the statements were hearsay, the statements qualify as admissions under ER 801(d)(2), because the agents had either actual or apparent authority, citing

*Hartman v. Port of Seattle,* 63 Wn.2d 879, 389 P.2d 669 (1964) and *Equico Lessors, Inc. v. Tow,* 34 Wn. App. 333, 661 P.2d 597 (1983).

We find that both contentions fail. During trial, DBM offered testimony that certain state employees had told the contractor that the State would pay for all costs related to the flood damage. This was objected to by the State on the grounds that DBM failed to establish that the employees had authority to make such commitments. The court permitted further testimony as an offer of proof and to allow DBM the opportunity to lay a proper foundation. Although the scope of authority of various state employees was explored further, DBM did not again offer the disputed testimony.

Further, DBM's contention that the contract was verbally modified by agents of the State is contrary to the parol evidence rule. DBM acknowledged that, under the contract, any changes must be set forth in a written change order. Thus, the written change orders embody the parties' agreement as to additional compensation. It is the agreement itself which is controlling, not the subjective intent of the parties. *Barclay v. Spokane,* 83 Wn.2d 698, 521 P.2d 937 (1974). DBM further acknowledged that the change orders were only to pay for the direct costs of repairs and not for any indirect costs attributable only to delays caused by the orders.

We also find that DBM failed to establish that the state employees in question had either actual or apparent authority to commit the State to pay for the indirect costs attributable to the change work and stop work orders. For a statement of a third party to be admissible as an exception to the hearsay rule under ER 801(d)(2), it must be proved that the statement is

> (iii) a statement by a person authorized by him to make a statement concerning the subject, or (iv) a statement by his agent or servant acting within the scope of his authority to make the statement for the party, . . .

Conflicting evidence was presented to the court as to

110

whether DBM was aware that the state employees in question were without authority to admit liability on behalf of the State. Further, apparent authority can only be established from the conduct of the principal, and not by the conduct of the agent. *See Equico Lessors, Inc.,* 34 Wn. App. at 338. DBM attempted to establish apparent authority only from the conduct of the agents, which is insufficient. Accordingly, we find that the court did not err in excluding the offered testimony regarding the alleged admissions of liability.

Judgment affirmed.

WORSWICK, C.J., and REED, J., concur.

Review denied by Supreme Court May 24, 1985.