[No. 14581–9–I. Division One. September 22, 1986.]

ROSALIE CODD, *as Personal Representative, Appellant,* v. STEVENS PASS, INC., *Respondent.*

*Lawrence Longfelder, Nicholas Wagner, Kerry D. Kidman,* and *Morrow, Longfelder, Tinker & Kidman, Inc., P.S.,* for appellant.

*Thomas D. Kelley, Charles E. Peery,* and *Preston, Thorgrimson, Ellis & Holman,* for respondent.

REVELLE, J.*—Plaintiff Rosalie Codd appeals a jury verdict in favor of defendant Stevens Pass, Inc., finding no negligence in this wrongful death action arising from the skiing death of Bryan Codd at the Stevens Pass ski area. Codd maintains that the court erred in giving certain instructions and in refusing to give others, in excluding a statement from evidence and in excluding evidence of a warning sign which was subsequently placed after the accident above the accident site by Stevens Pass. Codd appealed directly to the Supreme Court pursuant to RAP 4.2. The Supreme Court transferred it here. We reverse and remand for a new trial.

Bryan and Rosalie Codd, with their two teenage children, came to Seattle on December 23, 1979, to spend Christmas with friends. On December 27, 1979, they visited friends who lived near Stevens Pass and went skiing at the ski area. Bryan was an advanced intermediate skier and had been skiing for 11 years. However, neither Bryan nor son Jeff had skied at Stevens Pass before.

For most of the afternoon, Bryan and Jeff skied together on the higher, more difficult slopes. Toward the end of the afternoon, Bryan and Jeff headed down toward the base of the ski area. They had nearly reached the base when they came to the slope serviced by the Daisy chair lift. The Daisy run was the "bunny hill" of Stevens Pass. It was one of the gentlest and easiest runs on the mountain, and it was used primarily by beginners.

Partway down the Daisy run, it splits into two branches. After beginning their descent down one of the two branches, Bryan and Jeff agreed to ski the ungroomed area between the two branches which had many moguls because the two groomed trails looked too easy. It was undisputed that this ungroomed area was well used by both intermediate and beginner skiers seeking to improve their skiing skills.

---

*Judge George H. Revelle is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

Bryan started down this middle area first and soon disappeared around a knoll. Jeff did not, therefore, see his father's fall. Several witnesses, however, did see fragmented parts of the accident from the chairlift above. Apparently, Bryan was skiing conservatively at a moderate speed and in control when he caught the edge of his ski and flew into the air. He then caught his ski tips on a mogul, then plummeted headfirst into a mogul. When Jeff arrived he found Bryan unconscious. Jeff then skied downhill to summon help. Bryan died later at the first aid station.

A mogul is a mound of snow formed by many different things such as a rock or a place where many skiers have turned around at a particular spot and carved out a place in the snow. The accident area had many moguls. Under the accident area was a rock field estimated to be about 50 by 250 feet. It included boulders up to 4 and 5 feet in diameter. Stevens Pass acknowledges that when the snow cover was low, the accident area was hazardous because of the boulders, but maintains it was safe on the day of the accident. One of the doctors testified that the most probable cause of Bryan's death was that his head hit a snow covered rock where he fell. The jury returned a verdict in favor of Stevens Pass. Codd appeals.

### Jury Instructions

Codd maintains that the court erred in giving the following instructions: Instruction 13 on assumption of risk, instruction 14 on duty of recreational skier, instruction 16 on negligence per se and instruction 18 on contributory negligence.

She also maintains the court erred in failing to give plaintiff's proposed instruction 17.1 on reasonable care in giving warnings. For instructions to be sufficient, they must correctly state the law, not be misleading and permit each party to argue his theory of the case. *Rottinghaus v. Howell,* 35 Wn. App. 99, 108, 666 P.2d 899 (1983).

Under the common law, a skier is a business invitee of the ski area operator. The operator owes an affirmative

duty to the skier, as the invitee, to discover dangerous conditions through reasonable inspection, then repair that condition or warn the invitees of the hazard, unless it is known or obvious. *Egede–Nissen v. Crystal Mt., Inc.*, 93 Wn.2d 127, 132, 606 P.2d 1214 (1980); Restatement (Second) of Torts § 343 (1965). This duty extends only to the "area of invitation," *e.g.*, that area an invitee is reasonably led to believe is open to him. *Egede–Nissen*, at 132; *Mesa v. Spokane World Exposition*, 18 Wn. App. 609, 613, 570 P.2d 157 (1977); Restatement (Second) of Torts § 332, comment *l* (1965). If limitation to a general invitation is sought, the inviter must make the limitation apparent to the invitee either expressly or by obstructing or otherwise segregating the limited portion. *Mesa*, at 613. The status of a public invitee is retained as long as the invitee remains within the area of invitation. Thus, under the common law, Stevens Pass would have a duty to warn, not only where latent dangerous conditions existed, but also where the boundaries of the business invitation were, unless obvious.

Washington statutory law modifies, but is generally consistent with, the common law. RCW 70.117.010(1)–(9) requires the ski operator to maintain a sign system, *i.e.*, give notice to the skier regarding ski level ability needed on different slopes and indicate which trails and slopes have been closed.[1]

---

[1]RCW 70.117.020 provides:

"(1) In addition to the specific requirements of this section, all skiers shall conduct themselves within the limits of their individual ability and shall not act in a manner that may contribute to the injury of themselves or any other person.

"(2) No person shall:

"(a) Embark or disembark upon a ski lift except at a designated area;

"(b) Throw or expel any object from any tramway, ski lift, commercial skimobile, or other similar device while riding on the device;

"(c) Act in any manner while riding on a rope tow, wire rope tow, j–bar, t–bar, ski lift, or similar device that may interfere with the proper or safe operation of the lift or tow;

"(d) Wilfully engage in any type of conduct which may injure any person, or place any object in the uphill ski track which may cause another to fall, while traveling uphill on a ski lift; or

"(e) Cross the uphill track of a j–bar, t–bar, rope tow, wire rope tow, or other

■ However, RCW 70.117.020(7) arguably may be inconsistent with the common law where it states that "any person skiing on other than improved trails or slopes within the area shall be responsible for any injuries or losses resulting from his or her action." This provision bars a skier's recovery for injuries incurred in other than the delineated areas. Interpretation of a statute is a question of law to be determined by the court. *Condit v. Lewis Refrigeration Co.*, 101 Wn.2d 106, 676 P.2d 466 (1984). The problem becomes determining what are "improved trails or slopes within the area" where the ski area operator continues to have a duty to the skier. The first question is whether "other than improved" modifies only "trail" or both "trail" and "slope". The next question is whether "slope within the area" includes the portion between the two Daisy runs.

---

similar device except at designated locations.

"(3) Every person shall maintain control of his or her speed and course at all times, and shall stay clear of any snowgrooming equipment, any vehicle, any lift tower, and any other equipment on the mountain. Snow grooming equipment or any other vehicles shall be equipped with a flashing yellow light at any time the vehicle is moving on or in the vicinity of a ski run.

"(4) A person shall be the sole judge of his or her ability to negotiate any trail, slope, or uphill track and no action shall be maintained against any operator by reason of the condition of the track, trail, or slope unless the condition results from the negligence of the operator.

"(5) Any person who boards a rope tow, wire rope tow, j-bar, t-bar, ski lift, or other similar device shall be presumed to have sufficient abilities to use the lift. No liability shall attach to any operator or attendant for failure to instruct the person on the use of the device, but a person shall follow any written or verbal instructions that are given regarding the use.

"(6) Because of the inherent risk in the sport of skiing all persons using the ski hill shall exercise reasonable care for their own safety. However, the primary duty shall be on the person skiing downhill to avoid any collision with any person or object below him or her.

"(7) Subsection (6) of this section notwithstanding, any person skiing on other than improved trails or slopes within the area shall be responsible for any injuries or losses resulting from his or her action.

"(8) Subsections (6) and (7) of this section notwithstanding, any person on foot or on any type of sliding device shall be responsible for any collision whether the collision is with another person or with an object.

"(9) A person embarking on a lift or tow without authority shall be considered to be a trespasser."

■ The ski operator has a common law and statutory duty to a skier when he is on the "slope within the area". Stevens Pass basically urges us to limit its duty by defining "slope" as synonymous with "run" as opposed to the whole general area serviced by a chair and held out to the public as a skiing area. Under this "spot" theory, not only would Codd's accident site fail to be on a "slope" and thusly be out of the ski operator's scope of liability, but also under this theory, skiers would unknowingly ski in and out of different duties of care. Since this "spot" interpretation conflicts with the common law "area of invitation" doctrine, we decline to adopt it and hold that "slope" includes the whole area served by the Daisy chair, including the area between the runs where the accident occurred.

■ Stevens Pass contends that even if the accident site were on a "slope", Codd cannot recover because the slope was not "improved". First, we hold that the statutory term "improved" modifies only "trail". Thus, Stevens Pass's scope of liability extends to the accident site. However, even if "improved" also modified "slope", Stevens Pass's duty would still extend to the area since we concur with the trial court that the "slope" where the accident occurred was "improved" within the meaning of the statute.

The term "improved" is not defined in the statute. Evidence indicated that neither "improved" or "unimproved" was a term of art known or used in the ski industry. Where a term is undefined by statute, it should be given its ordinary meaning. *Pacific First Fed. Sav. & Loan Ass'n v. State,* 92 Wn.2d 402, 409, 598 P.2d 387 (1979). In ascertaining the ordinary meaning of statutory terms, courts frequently resort to dictionaries. *State ex rel. Graham v. Northshore Sch. Dist. 417,* 99 Wn.2d 232, 244, 662 P.2d 38 (1983). *Webster's New World Dictionary* 732 (College ed. 1968) defines "improve" as "1. to use profitably or to good advantage . . . 2. to raise to a better quality or condition; make better. 3. to make (land more valuable by cultivation, etc.)." Under all definitions, Stevens Pass had "improved" the accident site. The operator was using the area profit-

ably. It also had changed the physical landscape when they changed from rope tows to chair lifts in order to make the area more valuable. Even if improved applied to snow conditions, Stevens Pass admitted that Sno Cats occasionally went through the accident site to pack down the snow.

Thus, Stevens Pass had a duty to warn Codd if the accident area was latently hazardous, both under the common law and under an interpretation of the statute. Thus, RCW 70.117.020(7) does not bar Codd's recovery as a matter of law for any and all injuries that occurred to him while skiing.

### Instructions 14 and 18

Stevens Pass contends that instructions 14 and 18 properly define the ski operator's duty to Codd and Codd's duty to himself. The skier's duties to himself are different from those of the ski operator's and ski patroller's to Codd, as the skier. RCW 70.117.020(6) requires that skiers exercise reasonable care for their own safety. This is consistent with Washington's comparative fault law. RCW 4.22.005, 4.22-.015. RCW 70.117.020(3), (6) states that a skier must keep control of his speed and course and that the "primary duty shall be on the person skiing downhill to avoid any collision with any person or object below him or her." Finally RCW 70.117.020(1) provides:

> In addition to the specific requirements of this section, all skiers shall conduct themselves within the limits of their individual ability and shall not act in a manner that may contribute to the injury of themselves or any other person.

■ By equating the ski patroller's and ski operator's duty with that of the skier's, instruction 14[2] incorrectly

---

[2]Instruction 14 reads:

"Skiers and ski patrol employees each respectively have a duty to use reasonable care in keeping a lookout for any condition which appears to constitute a serious, unnecessary risk of injury to the skier. The failure to see or detect such a hazard in time to take remedial action required by ordinary care constitutes negligence if a reasonably prudent skier or ski patrol employee exercising ordinary care in the same or a similar situation would have noticed it, but does not consti-

states the law because their relative duties do differ. The operator has a duty to discover hazards which are not obvious, then repair them or warn the skier of them while the skier does not. The operator has the further duty to warn skiers of dangers delineated in RCW 70.117.010 whether obvious or not (*i.e.*, inform whether trails or slopes are closed or whether they are advanced, intermediate or beginning). Because the last line of instruction 14 seems to relieve the operator from the duty to discover and warn about latent danger when a skier is not using reasonable care, it is in error.

Instruction 18[3] partially mitigates this problem by stating that the ski operator must make reasonable inspections to discover hazards. However, the instruction is fatally flawed when it states that "it is the duty of a ski area operator to . . . afford trails and slopes reasonably safe for skiers exercising reasonable care" because it impliedly treats assumption of the risk and contributory negligence as a bar to Codd's recovery.

Assumption of the risk is a type of contributory negligence and has no independent significance in Washington. *Lyons v. Redding Constr. Co.,* 83 Wn.2d 86, 515 P.2d 821 (1973). However, Washington courts have adopted Prosser's analysis of assumption of the risk and have concluded that those who participate in sports or amusement subjectively assume known risks of being hurt.[4] Assump-

---

tute negligence in the same or similar situation where a reasonably prudent skier or ski patrol employee would not have noticed it."

[3]Instruction 18 reads:
"It is the duty of a ski area operator to make reasonable inspections to discover serious, unnecessary hazards and to provide reasonably safe trails and slopes to such extent as the exercise of reasonable care on the part of the ski area operator will afford trails and slopes reasonably safe for skiers exercising reasonable care for their own safety. Failure to perform a duty constitutes negligence."

[4]This is true even though we are applying the comparative negligence statute, former RCW 4.22.010 (as this claim arose prior to July 26, 1981, RCW 4.22.925), which states that contributory negligence shall not bar recovery, but instead it

tion of risk in this form is not assumption of the risk as a type of contributory negligence. Instead, it is in reality the principle of no duty—hence no breach and no underlying cause of action. *Ridge v. Kladnick,* 42 Wn. App. 785, 788, 713 P.2d 1131 (1986); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 68, at 485 (5th ed. 1984). However, even under *Ridge,* sportspersons do not assume the risk of unobvious dangers or assume statutory duties imposed on others for the sportsperson's protection. Thus, instruction 18 fatally misled the jury when it implied assumption of the risk barred Codd's recovery.

Moreover, instruction 18 is confusing and wrongly implies that the ski operator's duty to make inspections and discover hazards does not extend to those skiers not exercising reasonable care.

■ Looking at the instructions as a whole, we hold that the court erred when it gave instructions 14 and 18 since they were confusing and misstated the law. We also hold that the errors were not harmless since the misstatement of the law probably affected the outcome of the trial.

### Instructions 16 and 17

Codd contends that the court's instruction 17 on the statutory obligations of the skier to "maintain control of their course and speed at all times," read with a negligence per se instruction, erroneously made falling while skiing negligence per se. As such she maintains that the court erred when it refused to give an instruction that falling was excusable because the jury was then not advised of this theory of the plaintiff's case. *See Egede–Nissen v. Crystal Mt., Inc.,* 93 Wn.2d 127, 135, 606 P.2d 1214 (1980). We do not have to reach whether RCW 70.117.020 is relevant to negligence per se or whether the court erroneously failed to provide an instruction on excuse since we hold that the jury never reached the question of contributory negligence.

merely reduces a party's damages by the percentage of the negligence attributed to him.

Thus the instructions did not affect the verdict. *Jones v. Robert E. Bayley Constr. Co.*, 36 Wn. App. 357, 362, 674 P.2d 679 (1984).

## Proposed Instruction 17.1

Codd next contends that the court erred when it failed to give an instruction on negligent warning. Codd maintains the ski operator negligently warned the decedent when it ribboned off a jump downhill from the accident site because the warning left skiers with the impression that the accident area had been inspected for hazards. One who attempts, albeit gratuitously, to warn a person in danger must do so with reasonable care. If his failure to exercise such care results in an increased risk of harm, he is liable for any physical damage which the reliance causes. *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 299, 545 P.2d 13 (1975) (State's failure to adequately warn buyers of avalanche risk).

 Because Stevens Pass does not dispute that it was warning skiers on the lower slope, the applicability of the warning law to this case turns on the breadth of that warning. The issue becomes whether a reasonable skier would believe that Stevens Pass was attempting to warn about all latent dangers on the Daisy Slope or whether a skier would believe that the warning was confined only to the jump. A party has a right to have his theory of the case presented to the jury if there is substantial evidence to support it. *Egede–Nissen*, at 135; *Haysom v. Coleman Lantern Co.*, 89 Wn.2d 474, 481–82, 573 P.2d 785, 93 A.L.R.3d 86 (1978). Codd should have had an instruction on this theory since substantial evidence supported it leaving to the trier of fact determination of the breadth of warning issue.

## Ski Patroller's Statement

After the accident, as Bryan lay dying in the snow, a man with a ski patrol patch, belt radios and "fanny" pack arrived and "took over things". To Jeff's question "why is the area like this?", the man purportedly responded that "it should have been roped off before hand".

## A. As an Admission

Codd contends this statement was an admission of a party opponent and an exception to the hearsay bar. ER 801(d)(2) provides that a statement is not hearsay if:

> The statement is offered against a party and is . . . (iii) a statement by a person authorized by him to make a statement concerning the subject, or (iv) a statement by his agent or servant acting within the scope of his authority to make the statement for the party . . .

█ When applying ER 801(d)(2), Washington follows Restatement (Second) of Agency § 286 (1958), which requires an agent to have speaking authority. *Hartman v. Port of Seattle,* 63 Wn.2d 879, 885, 389 P.2d 669 (1964); *Donald B. Murphy Contractors, Inc. v. State,* 40 Wn. App. 98, 108–10, 696 P.2d 1270 (1985).

Restatement (Second) of Agency § 288, comment *c* states that:

> [U]nder the rule stated in Section 286, it is not enough that the principal is willing or permits the agent to speak. The speaking must be done in the capacity of agent and be connected with the business of principal . . . If his authority is to make statements only to particular persons or upon a particular occasion, the principal is not affected by statements made by him to other persons or upon other occasions.

Stevens Pass contends that even if the patrolman were adequately identified, the ski patroller did not have specific authorization to speak for his principal, Stevens Pass. Speaking authority may be implied. *Hartman v. Port of Seattle, supra* (where a resident engineer's statement was found an admission); *Griffiths v. Big Bear Stores, Inc.,* 55 Wn.2d 243, 347 P.2d 532 (1959) (where a store manager's statement was found an admission). *Donald B. Murphy Contractors, Inc. v. State, supra.* Codd urges that speaking authority be implied from the Ski Patrol manual which states that patrollers are "representatives of ski area." Codd points out that the explicit disallowance of speaking authority in the manual referred only to chair lift accidents. In addition, she points out that the responsibilities of

patrollers as outlined in the manual were similar to those responsibilities of agents in *Hartman* and *Griffiths* where speaking authority was implied.

However, the ski manual also states that "If you believe a change is needed in a sign placement, discuss it with your Hill Captain or Shift Supervisor." Because this indicates that a regular ski patrolman would lack authority to determine if a hazard existed, we hold therefore the patrolman lacked ability to inculpate the company if a sign was absent.[5] The court did not abuse its discretion when it did not allow the statement into evidence as an admission of a party opponent under ER 801(d)(2).

### B. As an Excited Utterance

Codd next maintains that even if the statement were not admissible as an admission, it should be admitted as an excited utterance. Excited utterances, like admissions, are not barred by the hearsay rule. ER 803(a)(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." An excited utterance need not be completely spontaneous; responses to questions may be admissible.

> The crucial question in all cases is whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.

*Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969); *see also State v. Downey*, 27 Wn. App. 857, 861, 620 P.2d 539 (1980).

The admission of relevant evidence lies within the sound discretion of the trial court. *Maehren v. Seattle*, 92

---

[5]Codd urges this court to find it unconscionable and against public policy for a corporation to use a company policy of "Don't say anything that could be used against the company in court" in order to escape liability from admissions made by its otherwise speaking employees. Although it may be unconscionable *if* Stevens Pass instructed all speaking agents not to make any admission, there is no evidence to suggest Stevens Pass had done this.

Wn.2d 480, 488, 599 P.2d 1255 (1979), *cert. denied,* 452 U.S. 938 (1981). Cobb has not shown that the trial court abused its discretion; that the exercise of discretion was manifestly unreasonable, based on unreasonable grounds for untenable reasons. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971). However, note, on remand this statement might be admissible as an excited utterance. That final determination is within the trial court's discretion and depends upon the record made during the new trial.

## SUBSEQUENT REMEDIAL MEASURE

Codd finally contends that the trial court erred when it failed to admit into evidence for impeachment purposes, that Stevens Pass installed a "Danger—Rocks" sign uphill from the accident site.

ER 407 provides:

> [E]vidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Traditional reasons for excluding post–accident changes are that such changes are not relevant to alleged tortfeasor's objective conduct and perception before the accident, but rather to his subjective beliefs which are not pertinent to the question of negligence and that a policy exists which encourages subsequent repairs. *Haysom v. Coleman Lantern Co.,* 89 Wn.2d 474, 483–86, 573 P.2d 785, 93 A.L.R.3d 86 (1978).

The court has broad discretion to exclude evidence it considers unduly prejudicial. ER 403. *Maehren,* at 488. Because admitting this evidence might have excited the jury into immediate assumption of Stevens Pass' guilt and because Stevens Pass may have only put up the sign for precautionary reasons, this ruling was not an abuse of discretion and not founded on untenable grounds or for

untenable reasons. *State ex rel. Carroll v. Junker, supra.*

We reverse the judgment and remand for a new trial consistent with the views expressed in this opinion.

WILLIAMS and COLEMAN, JJ., concur.

Review denied by Supreme Court January 6, 1987.