[No. 27084-2-I.   Division One.   June 1, 1992.]

RAINIER NATIONAL BANK, *as Trustee, Plaintiff*, v. DUANE A. WELLS, ET AL, *Appellants*, CHICAGO TITLE INSURANCE COMPANY, *Respondent*.

*David J. Lawyer, Evan E. Inslee,* and *Inslee, Best, Doezie & Ryder, P.S.,* for appellants.

*Ruth L. Edlund* and *Bogle & Gates,* for respondent.

SCHOLFIELD, J. — Appellants Duane and Gertrude Wells and Val Bain (Wells), sellers of an office building to Rainier National Bank (Rainier), appeal a summary judgment in favor of Chicago Title Insurance Company, an intervenor and subrogee under Rainier, in which the sellers were ordered to reimburse Chicago Title $49,349.24 in local improvement district (LID) assessments it paid to the City of Renton, including interest and attorney's fees. We reverse.

FACTS

The appellants built the Earlington Plaza Office Building in Renton in the 1970's. On December 14, 1984, the Renton city clerk received a diagram and preliminary assessment roll of a local improvement district (LID), No. 330, which included the property in question, and was available to the public in the city clerk's office from that day forward. On December 17, 1984, the Renton City Council passed Resolu-

tion 2584, declaring its intention to make improvements, notifying all persons who may desire to object, "and creating Local Improvement District No. 330." On January 28, 1985, a public hearing was held to consider the proposed LID. At that meeting, Wells protested the method that the City used to estimate the proposed assessment. A motion carried to "recommend the City proceed with LID 330 and refer this matter to Ways and Means Committee for proper legislation." Two weeks later, on February 11, 1985, the City passed Ordinance 3890 establishing the LID. The final assessment roll was not confirmed until after the improvements were completed and their costs known in early 1988.

In December 1986, after the LID was established by ordinance but before the final assessment roll was confirmed, Wells and Rainier finalized an agreement to sell the property for $1,550,000 to Rainier, a trustee under the will of C.D. Martin, Jr. The agreement made no mention of LID 330, but stated the seller would be responsible for "installments of special assessments" prior to closing. In the event of a default by the seller, a clause that the buyer may bring an action for damages was stricken and initialed by both parties, leaving only specific performance available as a remedy for the buyer after closing. Although the parties signed a second, separate agreement at closing, the first agreement specifically provided that its terms would remain in force subsequent to closing.

On December 9, 1986, Chicago Title Insurance Company issued a title insurance preliminary report, and on December 30, 1986, it issued a policy with Rainier as beneficiary. Neither the preliminary report nor the Chicago Title policy mentioned LID 330. The policy stated that it "does not insure against loss or damage by reason of . . . special assessments which are not shown as existing liens by the public records."

After the LID improvements were completed, the City of Renton gave notice of a public hearing in April 1988 on the final assessment roll for LID 330, and later that month the

assessment roll was entered. Wells refused Rainier's request to pay the property's share of the assessment. Rainier sued Wells, claiming Wells should indemnify Rainier for the LID assessment. Chicago Title paid the assessment on behalf of Rainier in 1989 and intervened in the suit against Wells.

The trial court granted summary judgment to Chicago Title on August 17, 1990, ordering Wells to pay the assessment of $42,542.45 plus interest and costs. This appeal by Wells followed.

### THE AGREEMENT

LID's may be "ordered only by an ordinance of the city or town council, pursuant to either a resolution or petition . . .." RCW 35.43.070. After the ordinance forms the LID, a number of other steps are necessary before a property owner is liable to pay an assessment, including a protest period; authorization of design work and bidding; completion of the project; computation of the final assessment roll (with hearings); and confirmation of the assessment roll by ordinance.

RCW 35.50.010[1] provides that a lien normally attaches when the assessment is ready to be collected. As between a vendor and vendee, however, if there is no express agreement as to the payment of the LID assessments, the lien

---

[1]RCW 35.50.010 provides in part:

"The charge assessed upon the respective . . . property in the assessment roll confirmed by ordinance . . . shall be a lien upon the property assessed from the time the assessment roll is placed in the hands of the city or town treasurer for collection, but as between . . . vendor and vendee of any real property, when there is no express agreement as to payment of the local improvement assessments against the real property, the lien of such assessment shall attach thirty days after the filing of the diagram or print and the estimated cost and expense of such improvement to be borne by each lot, tract, or parcel of land, as provided in RCW 35.50.005."

RCW 35.50.005 provides in part:

"Within fifteen days after any city or town has ordered a local improvement and created a local improvement district, the city or town shall cause to be filed . . . the assessments for such improvement, the title of the improvement and district number and a copy of the diagram or print showing the boundaries of the district and preliminary assessment roll . . .."

attaches 30 days after the preliminary filings required by RCW 35.50.005.[2] The threshold question is thus whether the parties had an express agreement concerning payment of special assessments. If the parties did have such an agreement, then the lien attached after the sale, and the buyer, not Wells, would be statutorily liable for the assessments.

■ Paragraph 11 of the parties' agreement states that "installments of current year special assessments" shall be prorated. LID 330 is a special assessment, though not a "current year" special assessment, which logically refers only to special assessments in the year of the agreement, or 1986. However, paragraph 11 also states: "Seller shall be responsible for all . . . installments of special assessments for any period prior to the Closing", without reference to "current year" assessments. Since the clause limits the seller's liability for assessments to those accruing prior to closing, it follows logically that the buyer is responsible for special assessments accruing *subsequent* to closing. We hold that this provision of paragraph 11 manifests an explicit intention by the parties to allocate responsibility between the parties to pay the special assessment from LID 330 according to when the assessment becomes due. Indeed, the word "installments" enhances this interpretation, because it suggests that even if a final assessment constituting a lien existed prior to the sale, as is not the case here, any amount owed for assessments coming due subsequent to the sale of the property would be borne by the buyer. Any other reading of the clause would be strained. Short of specifically

---

[2]Attachment of the lien does not occur earlier, however, than after an LID is established by ordinance. RCW 35.50.010 states that the charges in an assessment roll "confirmed by ordinance" shall be a lien when the treasurer is given the assessment roll. If there is no express agreement between a vendor and vendee, "the lien of *such* assessment [*i.e.*, "confirmed by ordinance"] shall attach thirty days after the filing of the diagram" as provided under RCW 35.50.005. (Italics ours.) RCW 35.50.010. A contrary rule, as argued by Rainier, would attach a lien before there is an underlying ordinance establishing an LID — an untenable result. However, because of the grounds for our decision, we do not reach the issue of when an assessment attaches in the absence of an explicit agreement.

mentioning LID 330 by name, there is little the parties could have done to make their allocation of the cost of an assessment clearer.

Although we find this issue to be dispositive, there are two additional bases for our holding: whether Chicago Title was liable to Rainier for the assessment under its title policy and whether the buyer agreed to relinquish damages as a remedy.

Wells contends that because Chicago Title expressly excluded unrecorded special assessments from its title policy, it was a volunteer payor with no rights against the sellers. Chicago Title argues that by statute the LID assessment attached before the sale, and it was thus not a volunteer. At oral argument, Chicago Title also maintained that a lien existed in the public record at the time of sale.

Chicago Title's policy excluded coverage for "loss or damage by reason of the following exceptions: 1. Taxes or special assessments which are not shown as existing liens by the public records." Although the property at issue was included within the LID records filed with the city clerk as early as December 14, 1984, at the time of the sale there was no publicly recorded "existing lien". Under RCW 35.50.010, attachment of the lien in this case did not occur until 1988, well after sale of the property, when the assessment roll was "placed in the hands of the city or town treasurer for collection . . .." RCW 35.50.010.

■ By paying the assessment, Chicago Title does not appear to have been protecting its own rights, because under the policy it was not liable if there was no existing recorded lien. A subrogee, such as Chicago Title, pays or discharges in order to protect its own rights, *Livingston v. Shelton*, 85 Wn.2d 615, 619, 537 P.2d 774 (1975), *cert. denied*, 424 U.S. 958, 47 L. Ed. 2d 365, 96 S. Ct. 1437 (1976); otherwise, it is a volunteer. "One is a 'volunteer' . . . if, in making payment, he has no right or interest of his own to protect and acts without obligation, moral or legal . . .." *Newcomer v. Masini*, 45 Wn. App. 284, 288-89, 724 P.2d 1122 (1986). Based on the clear exception that Chicago Title included in its title policy, and

the absence of a lien against the property in question shown in the public record, Chicago Title is a volunteer with no claim against the sellers.

The other issue is Wells' contention that Rainier bargained away its right to sue for damages when it struck the clause stating that the buyer may bring an action for damages. At oral argument, Chicago Title contended the clause was within an earnest money agreement that was superseded by the final closing agreement.

██ The initial agreement specifically excluded the buyer's right to sue for damages.[3] Such an exclusion of a remedy is permissible under Washington law:

> [W]here the probability of the happening of the condition has been foreseen and a remedy is provided for its happening, the presumption is that the parties intended the prescribed remedy as the sole remedy for the condition . . ..

*Donald B. Murphy Contractors, Inc. v. State*, 40 Wn. App. 98, 107, 696 P.2d 1270 (quoting *Goss v. Northern Pac. Hosp. Ass'n*, 50 Wash. 236, 239, 96 P. 1078 (1908)), *review denied*, 103 Wn.2d 1039 (1985).

The suit to recover payment made to the City of Renton is based on Rainier's contention that, under the agreement, Wells should have paid the LID assessment. Chicago Title offers no argument that the suit is not one for damages, yet the parties explicitly restricted the buyer's remedy to specific performance, disallowing damages. Characterizing the contract as an "earnest money" agreement is not helpful to Rainier's position, because regardless of how it is characterized,[4] the agreement provided that "All warranties, repre-

---

[3] The sales agreement states:

"In the event of a default by Seller hereunder, Buyer may, at Buyer['] s option, do any of the following:

"14.3 Terminate this Contract by written notice delivered to Seller at or prior to the Closing . . ..

"14.4 Enforce specific performance of this Contract against Seller; or

"14.5 ~~In addition to and not to the exclusion of the remedy in subparagraph 14.3 above, bring an action against Seller for damages.~~"

[4] *See Reed v. Eller*, 33 Wn. App. 820, 824, 664 P.2d 515 (real estate contract was characterized as an earnest money agreement), *review denied*, 99 Wn.2d 1015 (1983).

sentations and agreements contained herein or arising out of the sale of the Property by Seller to Buyer shall survive Closing hereof." Given Chicago Title's subrogation of rights under Rainier, and the parties' specific exclusion of damages as a remedy in a contract meant to extend beyond the closing,[5] Chicago Title appears unable to seek damages in this case.

Because the parties' agreement between Rainier and Wells authorized attorney's fees, and Wells requested fees in his appellate brief, we award fees to Wells under RAP 18.1.

Reversed and remanded for further proceedings consistent with this opinion.

PEKELIS and KENNEDY, JJ., concur.

---

[5]The closing agreement, as distinct from the sales agreement, contemplated damages insofar as they are sustained by the buyer in connection with the declaration of covenants. However, the damages referred to are only allowed in the context of the declaration of covenants, from which the claim here at issue does not arise.

Additionally, we find the closing agreement does not hold Rainier harmless for any LID assessments based on the wording of an earlier covenant.